No. 80149–Agenda 3–September 1997.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JUAN CORTES, Appellant.

Opinion filed January 23, 1998.

JUSTICE HARRISON delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant, Juan Cortes, was convicted of four counts of first degree murder (Ill. Rev. Stat. 1991, ch. 38, par. 9–1) and two counts of armed robbery (Ill. Rev. Stat. 1991, ch. 38, par. 18–2). Defendant elected to have the trial court determine his sentence, and the court found that he was eligible for the death penalty because he was convicted of murdering two or more individuals and because the victims were killed in the course of another felony. Ill. Rev. Stat. 1991, ch. 38, par. 9–1(b)(3), (b)(6). The court further determined that there were no mitigating factors sufficient to preclude imposition of a sentence of death. See Ill. Rev. Stat. 1991, ch. 38, par. 9–1(h). Accordingly, the court sentenced defendant to death. Defendant's execution has been stayed pending direct review of the case by this court. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d R. 603, 609(a).

On February 4, 1991, the bodies of the Gama brothers, Ayax, 34, and Rafael, 28, were discovered inside their apartment in Chicago. Each had been shot twice in the head at close range. Numerous items were later believed to be missing from the brothers' apartment, including a television set, jewelry, and a compact disc player. Defendant was arrested on February 26, 1991, and subsequently indicted on murder and armed robbery charges.

During the 3½ years between defendant's arrest and conviction, the question of his fitness to stand trial arose. On August 19, 1992, defense counsel Michael King told the trial court that he had “found out that [defendant] was in the Cermak Hospital for certain ailments and also in the psychiatric ward,” and had accordingly subpoenaed defendant's hospital records. On April 29, 1993, King requested that defendant be evaluated for fitness because King questioned defendant's ability to cooperate with counsel.

Thereafter, defendant was examined for fitness on four occasions, by three doctors, all of whom were employed by the Psychiatric Institute of the Cook County circuit court's Forensic Clinical Services Department. In May 1993, Dr. Paul Fauteck found defendant unfit for trial due to depression effecting his ability to adequately cooperate with defense counsel. Later that same month, Dr. Kishore Thampy found defendant fit to stand trial. Finally, in July 1993, Dr. Stafford Henry found defendant “fit to stand trial with medication.” Due to the “conflict” between these opinions defense counsel requested a fitness hearing, which the trial court ordered. However, on August 19, 1993, prior to defendant's next court appearance, Dr. Fauteck reexamined defendant and found him “fit to stand trial with medication.” Dr. Fauteck's report further noted that defendant's depression appeared to be in remission and that defendant “states he no longer needs to take the entire 300 mg. of Sinequan which is prescribed for him.” Based on Dr. Fauteck's revised opinion, defense counsel King withdrew his request for a fitness hearing.

On January 13, 1994, the trial court denied defendant's motion to suppress statements made to police following his arrest which alleged,
 inter alia
, defendant's inability to understand the English language. On January 25, 1994, new counsel, Richard Mottweiler, entered his appearance on defendant's behalf. Mottweiler represented defendant throughout the trial, sentencing and through a portion of the post-trial phase, at which time Michael King reentered the case.

On October 24, 1994, defendant's jury trial commenced. For the State, Chicago Police Officer Michael Cusak testified that during the late evening of February 4, 1991, he and his partner discovered the bodies of Ayax and Rafael Gama inside their apartment. The officers had entered the building on an unrelated case and found the Gamas' front door ajar. The door area was damaged, there were fresh wood chips and tool marks on the door shim, and the apartment was in disarray. One of the deceased lay face down on the floor in a pool of blood and the other was on a couch. The apartment was very warm and most of the blood was drying.

Chicago Police Detective Bill Johnston testified that he examined the crime scene and noticed from dust outlines that there were vacant areas on an entertainment center in the living room. A television remote control was discovered but no television was found. Johnston believed that the damage to the front door was from a screwdriver but that entry to the apartment had been gained by the application of brute force, as by shouldering the door.

Chicago Police Officer Joe Moran, a forensic investigator, processed the Gamas' apartment for evidence on February 4, 1991. Moran photographed the scene and recovered a fired bullet from the floor. He recovered ridged fingerprint impressions from the front door and from various items, including a telephone, beer bottle, drinking glass and candy jar. These items were collected for further fingerprint analysis at the crime laboratory. Chicago Police Officer Stanley Mocadlo, a latent print examiner, testified that the candy jar found at the scene contained the prints of defendant's right thumb, index and middle fingers. Mocadlo agreed that, depending on the environment, fingerprints can remain on a surface indefinitely. The parties stipulated that if Officer Richard Chenow, a firearm examiner for the Chicago police department, were to testify he would state that he examined the fired bullet recovered from the Gamas' apartment, as well as three fired bullets and a bullet fragment recovered from the victims' bodies. In Chenow's opinion, all of the bullets were “.38 Specials” and shared the same class characteristics. Because the bullets were unsuitable for further comparison of individual characteristics, Chenow could not determine whether they were all fired from the same gun. The parties also stipulated to the testimony of forensic pathologist Dr. Robert Kirschner. Dr. Kirschner's examination of Ayax Gama revealed the cause of death to be two close-range gunshot wounds, one to the back of the head and one to the back of the neck. The cause of Rafael Gama's death was also two gunshot wounds, one close-range wound to the head and one to the left side of the face.

Martin Diaz testified that he was a friend of Ayax and Rafael Gama, and knew that both of them were homosexuals. The brothers normally wore gold bracelets, rings and chains. Diaz had visited their apartment on several occasions and knew that the brothers stored jewelry and change in a glass jar located on an entertainment center or bookshelf. That unit also housed their 19-inch television set and Ayax's portable compact disc player. At trial, Diaz identified the glass jar and three compact discs belonging to the brothers and stated that the compact disc player and photograph of a television “looked like” the items previously owned by the Gamas. Diaz testified that when he visited the Gamas' apartment between 11 a.m. and noon on February 2, 1991, the jar and television set were in their customary positions on the entertainment center.

Diaz stated that the last time he saw either of the brothers was when he took Rafael Gama home at about 5 or 6 p.m. on the evening of February 2. He noted no damage to the Gama's front door that day. On the morning of February 3, Diaz unsuccessfully attempted to get the brothers to answer their door and phone. He later learned that they had been killed. The parties stipulated that if Eddie Munoz were to testify, he would state that at approximately 7 p.m. on February 2, 1991, he spoke with the Gama brothers and invited them to his apartment, but was informed that they would be staying at home that evening.

Alex Torres initially testified that he had been convicted of burglary in 1993. By February 1991, Torres had known defendant for 9 or 10 months and knew him by various names, including “Ivan Torres,” “Ivan Flores” and the nickname “Boricua” (hereinafter Boriqua).
(footnote: 1) Torres knew defendant to speak both Spanish and English.

On February 2, 1991, at approximately 9 p.m., defendant stopped by Torres' apartment. Defendant was “drugged up” and “hyper.” He had a bag of “weed” and a bag of heroin with him which he, Torres and Torres' cousin proceeded to consume. Defendant stated that he was going to “stick up” the “Mexican fagots [
sic
].” Torres, who had met these men through defendant several weeks earlier and knew where their apartment was located, refused defendant's invitation to go along. Defendant left Torres' apartment between 9:30 and 9:45 p.m. and, shortly thereafter, Torres' girlfriend, Arlyn Torres, arrived with her daughter. Torres and Arlyn spent the remainder of the evening at home watching movies.

The following morning defendant returned to Torres' apartment, “more hyper” and “drugged up” and wearing gold jewelry which he was not wearing the night before. Defendant displayed various gold chains, rings, a watch, a compact disc player and some “CD cassettes.” One of the chains bore a name plate on it similar to that worn by one of the two homosexual men on the date Torres had met them. Defendant also flashed some money, claiming that it totaled $700. Defendant said that he “got paid” and bragged that he “did the Mexican fagots [
sic
] in” after taunting them about their sexuality. According to Torres, defendant demonstrated how he shot the two men and, at one point, pulled up his shirt, revealing a “two-shot .38 Derringer” tucked into his pants.

Defendant offered to sell the compact disc player to Torres, who purchased it for $30. Defendant then asked if Torres knew anyone who would be interested in buying a television. Torres called his sister, Lizette Torres, who told him to bring it over and that she would buy the television if it worked. An acquaintance, Jason Rivera, arrived and the three men drove in Rivera's car to the rear of the Gamas' apartment building. There, defendant retrieved a television from behind a dumpster and placed it in the trunk. The three proceeded to Torres' sister's apartment building and took the television to the first floor residence of a relative, Anna Cruz. Cruz bought the television from defendant for $150. The three men then left, picked up Arlyn and her child at Torres' apartment and drove them home. On the way to Arlyn's residence, defendant continued to brag about “killing the fagots [
sic
].”

The three men then drove to defendant's house where he retrieved another gun, a “.38 Special” revolver. Defendant then directed Rivera to an apartment where defendant ran inside and, upon returning, stated that he had sold the “.38 Special” for $125. Later, defendant briefly left Rivera's car and got into another vehicle, after which defendant said he had sold the other gun to his cousin. Defendant then bought Rivera and Torres food and narcotics. Torres next saw defendant a day or two later. Defendant invited Torres to accompany him and his girlfriend Nancy to “Liberty's Gold” pawn shop, where defendant sold the chains and rings he was wearing.

On February 20, Torres was arrested on a burglary charge. Torres initiated a conversation with police, telling them what he had heard defendant say about the murders. Because he did not want to get into trouble, Torres omitted mention of the fact that he had accompanied defendant to retrieve the television. Torres admitted that his motive in telling the police about the murders was “to try to get out of trouble” and that, during the 12 hours that he was held in custody at the station, the police offered to “try to help him out” on his burglary case. Several days later, Torres was able to “bond out” on the burglary charge, but was picked up by police on the night of February 25 and asked to provide more information. On the morning of February 26, Torres gave a written statement to an assistant State's Attorney. Torres admitted at trial that he also failed to mention the television's retrieval in this written statement. Torres later testified before the grand jury.

At trial, Torres was confronted with various inconsistencies between his grand jury testimony, his written and oral statements and his trial testimony, including: (1) whether he believed that defendant was going to kill or simply rob the victims; (2) what property defendant possessed on the morning of February 3; (3) whether he recognized the property as belonging to the Gama brothers; (4) whether it was Lizette Torres or Anna Cruz who had bought the television; and (5) what Jason Rivera's level of involvement was in the crimes. As to the latter two matters, Torres explained that he sought to protect Cruz from a stolen property charge and that he did not want to involve Rivera and Lizette Torres. Torres further admitted that the burglary charge he had been arrested for on February 20, 1991, was later dropped, but denied that there was any deal made in exchange for his trial testimony.

Arlyn Torres testified that she was Alex Torres' girlfriend in February 1991. On February 2, at approximately 10 p.m., Arlyn and her young daughter arrived at Torres' apartment and remained there with him the rest of the night. The next morning, Boriqua, the defendant, came to Torres' home. Defendant was “loud” and “hyper” and wore several gold rings and chains. Defendant began telling Torres, in English, about how he had shot the “Mexican faggots” in the head. Defendant laughed as he described how he had made the men “beg for their lives like bitches” before killing them. Arlyn testified that Torres then bought a compact disc player and “three CDs” from defendant and identified those items in court. Torres' friend Jason Rivera arrived and the three men left the apartment for approximately one-half hour. Arlyn was then driven home in Rivera's car. On the way, defendant continued to brag about the killings, saying he “did the Mexicans, the faggots, and he ain't scared of anybody,” that he would “take down” anyone who “messed” with him, and that he did not care about anything. From the conversation, Arlyn also learned about a television having been stolen. Arlyn admitted that she did not take defendant's statements about the killings seriously and denied making certain prior inconsistent statements.

 Lizette Torres testified that she knew defendant by the name Boriqua and had met him through her brother, Alex Torres. In February 1991, defendant spoke both English and Spanish, and Lizette had spoken to him in both these languages. When her brother called to ask if she knew anyone who would want to buy a television, she told him Anna Cruz, who lived in her building, was interested. After Torres, Rivera and defendant arrived with the television, a dirty 19-inch color model, and revealed it to be in working condition, Cruz paid defendant $150 for it. Anna Cruz testified that on February 3, 1991, she paid a man named Boriqua $150 for a television that he brought to her home. Cruz was unable to identify defendant as Boriqua at trial, but did identify a photograph of the television, which the police had confiscated in late February 1991.

Ralph Santiago testified that he was the president of Liberty Gold and Coin and was working at that store in February 1991. At trial, Santiago identified four receipts relating to business transactions conducted in his store. The first receipt, dated January 30, 1991, bore the name “Ivan Torres,” of 1917 North Pulaski, and reflected the sale of a bracelet and chain to the shop. The second receipt, dated February 2, 1991, listed the sale of seven gold rings, a charm and two bracelets. The seller was again “Ivan Torres,” of the same address. The third receipt, dated February 5, 1991, also bore the name “Ivan Torres,” but did not describe the items sold. The fourth receipt, also dated February 5, described a quantity of 14-carat gold sold by an “Ivan Flores.” Although Santiago had personally made the first two of these purchases, he could not identify the seller.

Chicago Police Detective Ernest Halvorsen testified regarding his investigation of these murders. On February 24, 1991, Halvorsen received information that a person named “Ivan Flores,” also known as “Juan Cortez,” may have been involved in the crime. Halvorsen checked with the crime lab the following day and discovered that defendant's fingerprints had been recovered from a jar found in the Gamas' apartment. Halvorsen arrested defendant shortly after midnight on February 26 and transported him to the police station.

After being informed that his fingerprints were found at the scene and that Alex, Arlyn and Lizette Torres had all given statements implicating him in the crime, defendant was advised of his 
Miranda
 rights in English and stated that he understood each one. Defendant then stated: “That fucken [
sic
] Alex gave me up. Well, you got me, but if I'm going to go down for these murders, I'm going to tell you about something that Alex did.” Defendant gave Halvorsen information implicating Torres in an unrelated case and then gave a statement relating to the murder of the Gama brothers.

Defendant's statement related that he lived at 1917 North Pulaski in Chicago. He had known the Gama brothers, whom he referred to as “faggots,” for about one year and had “partied” with them before. One of the Gama brothers used to pay defendant for anal intercourse. On Saturday, February 2, 1991, defendant told Torres and another man that he was going to “go by the Mexicans, get high with them and do them up.” Armed with a “.38 caliber Smith & Wesson revolver,” defendant arrived at the Gamas' apartment at about 10 p.m. and for the next few hours the three men drank beer and smoked marijuana and PCP. The brothers began to caress defendant, rubbing his crotch and buttocks. Defendant told the men several times to “leave me alone or I will kill you,” and then drew his gun. When Rafael began to laugh at him, defendant shot and killed Rafael. “A[ya]x began crying and grabbed for the gun,” the two struggled and defendant shot Ayax twice in the back of the head.

Defendant's statement further revealed that, after killing the brothers, defendant removed rings, chains and money from Ayax's body. He left the building and fell asleep in his car. After defendant awoke the following morning at approximately 9 a.m., he went to Torres' apartment and told him that he had killed the two Gamas. Defendant suggested that Torres return with him to the Gamas' apartment in order to take the television, compact disc player, money and anything else of value. Torres called a man named Jason and the three went to the apartment and retrieved the television set and compact disc player. The men then went to Lizette Torres' home, where they sold the television to Anna Cruz for $150. Torres kept the compact disc player. Defendant stated that he disposed of the jewelry he had taken from the Gama brothers at “Liberty Brothers Pawnshop.”

Halvorsen testified that his entire conversation with defendant, which lasted 20 to 30 minutes, was in English. At no time did defendant claim not to understand what was said or request an explanation. After taking defendant's statement, Halvorsen contacted the State's Attorney's office.

Assistant Cook County State's Attorney William Carroll testified that on February 20, 1991, he met with defendant at the police station and advised him of his 
Miranda
 rights in English. After stating that he understood each right that was read to him, defendant agreed to speak with Carroll and then gave a narrative account in English of the offenses. After Carroll explained the differences between a court-reported and a handwritten statement to defendant, he elected the latter and his oral admissions to Carroll were reduced to writing. Carroll testified that he asked defendant to read one paragraph of the completed statement aloud, then watched as defendant read each page to himself, made his desired corrections and signed each page. Defendant's written statement, which was published to the jury, was essentially consistent with the statement defendant had previously given to Halvorsen, except that defendant made no mention of pawning the victims' jewelry. Defendant admitted in his statement that he understood written and spoken English.

In response to the State's evidence that he had made a statement in English, defendant called four witnesses who testified to his inability to speak or understand the English language. Donald Navarro testified that he lived next door to defendant and his girlfriend Nancy Almodovar in 1989 and 1990 and spoke with defendant perhaps three times per week, but only in Spanish. Navarro observed defendant speaking with other people, but never in English. Navarro admitted that he and his wife were “grandparents to Nancy's brother” and that his two god-children lived at defendant's address at the relevant time. The parties later stipulated that Navarro had testified before the grand jury that he usually encountered defendant only once a week.

Edwin Rodriquez testified that he worked with defendant in 1988 in a shipping department for eight hours a day, five days per week. During that time, Rodriquez, who himself spoke little English, never observed defendant speaking any language other than Spanish. Rodriquez admitted that he had testified before the grand jury in English, that he was Donald Navarro's son-in-law, and that he lived next door to the Almodovar family and had known them since 1988.

Nancy Almodovar, who had recently married defendant, testified that she met him in 1989 and that they lived together from 1990 until he was jailed in 1991. Defendant “barely” spoke English and the two never held an entire conversation in that language. Almodovar never saw defendant converse with others in English, except for “[s]mall things” and “basic stuff.” Defendant would ask her to interpret if he did not understand something said to him in English. Almodovar admitted that she had previously testified that she had never observed defendant speak English. She did not recall if she had gone to a pawnshop with defendant in February 1991 to pawn gold. Almodovar stated that defendant did use the name “Ivan Flores,” but not the name “Ivan Torres.”

Ann Collins, an attorney with the Cook County public defender's office, testified that she had represented defendant in Judge Bolan's courtroom from late 1991 until January 1993. During that time, Collins had eight or nine conversations with defendant, all of which were conducted with the assistance of an interpreter. Collins never spoke to defendant in English. On cross-examination, Collins stated that she “did not represent [defendant] on the elected case,” but rather on some “other matter.” She did not recall whether defendant had made a statement in English in that other case, despite being shown a copy of a police report and her discovery motion.

In rebuttal, the State presented the testimony of Melissa Foss and Pradeep Roy-Singh. Foss testified that she was an adult probation officer for Cook County and that she had interviewed defendant in February 1990 in a Skokie courtroom where “[h]e had just been sentenced.” Foss did not specifically recall their conversation, but stated that she did not speak Spanish and did not accept people as probationers who do not speak English. After speaking with defendant, Foss accepted him as an assigned probationer. Defendant's motion for a mistrial, based upon improper “other crimes” evidence revealed by Foss' testimony, was denied.

Roy-Singh, an assistant State's Attorney, testified that he had an hour-long conversation in English with defendant on February 26, 1991, at the Area 5 police station. Roy-Singh stated that he had no difficulty understanding defendant's English, nor did defendant appear to have any difficulty understanding him. Roy-Singh also reviewed an eight-page document, written in English, with defendant and the only word in the document that defendant indicated he did not understand was the word “verbatim.”

At the conclusion of the evidence, the jury received instructions from the trial court and heard closing arguments. As noted at the outset of this opinion, the jury returned a verdict of guilty of first degree murder and armed robbery and the trial court sentenced defendant to death. Further description of defendant's trial, sentencing and post-sentencing proceedings is contained within the discussion of issues raised by defendant below.

Defendant first contends that he was denied the effective assistance of counsel and due process of law by his counsel's failure to demand a fitness hearing prior to his trial and sentencing based upon his ingestion of the psychotropic drug Sinequan before and during the time of those proceedings. Defendant additionally claims that the 
nunc pro tunc
, or retrospective, fitness hearing conducted approximately one year after he was tried and sentenced was not a constitutionally adequate substitute for a “timely” hearing. The State maintains that the fitness hearing defendant received satisfied due process and the statutory requisites of section 104–21(a) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/104–21(a) (West 1994)), and thus defense counsel was not ineffective where defendant suffered no prejudice from the belated hearing. We agree with the State.

Defendant's jury trial was conducted between October 24 and November 4, 1994, and his capital sentencing hearing was held on November 9 and 10, 1994. On May 23, 1995, defense counsel King presented a post-trial motion which cited this court's decision in 
People v. Brandon
, 162 Ill. 2d 450 (1994), and the appellate court's decision in 
People v. Guttierez
, 271 Ill. App. 3d 301 (1995). The motion also noted the August 1993 reports of Dr. Fautek and Dr. Henry declaring defendant fit to stand trial with medication. 
Because it was unclear whether defendant was receiving psychotropic medication at the time of his trial and sentencing, the court decided to conduct a fitness hearing to determine whether defendant had been fit during those proceedings and at his pretrial motion to suppress held in 1993. The trial court ordered a behavioral clinical examination of defendant and instructed defense counsel to determine the particulars of defendant's use of medication.

On September 28, 1995, the court announced it had received the results of the behavioral clinical examination. The report, authored two days earlier by Dr. Thampy, stated that defendant: (1) was not suffering from a serious psychiatric disorder; (2) was not presently receiving any medication; and (3) understood the nature of the proceedings against him and should be able to cooperate with counsel. The report further concluded that defendant was fit for trial during the period from October 1993 to January 1994 and during the month of November 1994. The report did not express an opinion as to whether defendant was fit in October 1994, and the trial court continued the matter for Dr. Thampy's appearance.

On October 20, 1995, a fitness hearing was conducted concerning defendant's fitness for trial in the instant case as well as in his unrelated pending murder case. At the outset, defense counsel King objected to the retrospective nature of the hearing and argued that a new trial was required due to the denial of a timely fitness hearing. The trial court disagreed. Dr. Kishore Thampy, a staff psychiatrist for Forensic Clinical Services for the circuit court of Cook County, testified that he examined defendant for fitness on three occasions, in May 1993 and in September and October 1995. Thampy also reviewed defendant's prior psychological and psychiatric evaluations, including the reports of Dr. Fautek and Dr. Henry, and defendant's health records, social history, transcripts from the sentencing hearing and police reports of the incidents.

Thampy testified that defendant's health records revealed that in October and November 1994, when the trial and sentencing proceedings occurred, defendant was receiving 100 milligrams of the psychotropic drug Doxepin, also known as Sinequan, “at bedtime.” While this medication is an antidepressant typically prescribed for the treatment of anxiety, sleep disorders and mild depression, it was Thampy's understanding that defendant “was prescribed the medication primarily to help him sleep and not specifically for depression.” Thampy stated that a 100-milligram dosage is considered in the “low to moderate” range, and could remain in the body in varying degrees of therapeutic effectiveness for several hours to several days. In a person of defendant's height and weight, the prescribed dosage would have no adverse effect except for mild persisting drowsiness.

Thampy further testified that, in his opinion, the Sinequan prescribed for defendant “would not significantly [a]ffect his ability to relate to others except by improving his interpersonal communication.” The drug would have no significant adverse impact upon defendant's ability to understand the nature of the proceedings against him or the role of the parties. Based upon his interviews with defendant and his review of defendant's testimony at the capital sentencing hearing, Thampy believed that defendant was capable of communicating with others, and of understanding the nature of the proceedings against him and the roles of the various parties in court. Thampy opined that, to a reasonable degree of medical certainty, defendant was fit to stand trial in October and November 1994, with or without the Sinequan medication, and was similarly fit at the present time. Nor would any of the other medications that defendant was then ingesting, including antibiotics and aspirin, have affected his fitness for trial or sentencing.

On cross-examination, Thampy acknowledged that he did not speak with defendant's trial attorney, Mottweiler, or with King regarding defendant's ability to cooperate with counsel. Thampy did not believe this step was necessary because his assessment of defendant's ability to cooperate was based on a general ability to cooperate with others, and a “selective type of lack of cooperation” with a particular attorney would not affect that determination. Thampy also acknowledged that Dr. Bachula, a treating psychiatrist at the jail, had noted that he “could be prescribing the Sinequan for *** `possible depression.' ”

On redirect, Thampy noted that although Dr. Fautek had concluded in May 1993 that defendant was too depressed to cooperate with counsel, Fautek had concluded in August 1993 that defendant was fit with medication and was able to cooperate with counsel and “follow appropriate courtroom procedures.” Thampy, while agreeing with Dr. Henry's July 1993 report that defendant had a “very sophisticated” understanding of the workings of the criminal justice system and understood the nature of the charges against him, disagreed with Henry's finding that defendant “demonstrated a willingness and capacity to work with his [counsel].” Thampy, however, believed that any lack of cooperation on defendant's part would be volitional and that no mental illness would prevent him from cooperating with his counsel.

At the conclusion of Thampy's testimony, the trial court found that defendant was fit for trial with or without medication in the instant case, as well as in his pending murder case. At a later hearing, defendant complained unsuccessfully to the court that defense counsel King had improperly failed to present his “psychological workers” and street acquaintances as witnesses at the fitness hearing. King responded that because he did not have a professional witness who was of the opinion that defendant was unfit, he had called no witnesses.

It is well established that “the failure to observe procedures adequate to protect a defendant's right not to be tried while unfit deprives him of his due process rights to a fair trial.” 
People v. Brandon
, 162 Ill. 2d 450, 456 (1994); see also 
People v. Nitz
, 173 Ill. 2d 151, 156 (1996); 
People v. Gevas
, 166 Ill. 2d 461, 468 (1995); 
People v. Murphy
, 72 Ill. 2d 421, 430 (1978). Accordingly, the legislature has enacted laws designed to protect a defendant's right not to be tried while unfit. Section 104–11(a) of the Code provides: “The issue of the defendant's fitness for trial, to plead, or to be sentenced may be raised by the defense, the State or the Court at any appropriate time before a plea is entered or before, during, or after trial.” 725 ILCS 5/104–11(a) (West 1994). Further, at the time applicable herein, section 104–21(a) of the Code provided: “A defendant who is receiving psychotropic drugs or other medications under medical direction is entitled to a hearing on the issue of his fitness while under medication.” 725 ILCS 5/104–21(a) (West 1994).
(footnote: 2)
Here, under section 104–21(a), defendant was entitled to a fitness hearing because he was prescribed Sinequan, a psychotropic drug, during the course of the criminal proceedings against him. See 
People v. Birdsall
, 172 Ill. 2d 464, 476, citing 
Brandon
, 162 Ill. 2d 450; 
Gevas
, 166 Ill. 2d 461; 
People v. Kinkead
, 168 Ill. 2d 394 (1995). Indeed, defendant's fitness was questioned by his defense counsel prior to trial and a hearing was scheduled, but counsel withdrew his request for a fitness hearing based upon the finding of Dr. Thampy that defendant was “fit for trial” and the findings of Drs. Fautek and Henry that he was “fit for trial with medication.” It was only post-trial and, notably, post-
Brandon
 that defense counsel resurrected this issue. Defendant correctly asserts that, under 
Brandon
 and its progeny, the failure herein to demand a fitness hearing prior to the trial and sentencing constituted ineffective assistance of counsel. When the trial court was presented with this evidence during the post-trial proceedings, what it should have done under 
Brandon
, 
Gevas
, 
Kinkead
, 
Birdsall
, and 
Nitz
 is to vacate defendant's conviction and sentence and grant him a new trial. See 
People v. Neal
, No. 82556, slip op. at 9 (November 20, 1997). “Making an after-the-fact determination as to the effect of the medication on defendant's fitness, as the court did here, was improper.” 
Neal
, slip op. at 9. However, after the trial court held the retrospective hearing and defendant initiated this appeal, our court issued its opinion in 
People v. Burgess
, 176 Ill. 2d 289 (1997).

“In 
Burgess
 we abandoned our prior view that retrospective fitness determinations were always improper. Instead, we held that a defendant who has been denied his right to a fitness hearing under section 104–21(a) is not entitled to a new trial if evidence subsequently presented to the court in a post-trial proceeding establishes that the defendant did not, in fact, suffer any impairment as a result of his ingestion of psychotropic medication. 
Burgess
, 176 Ill. 2d at 302-04.” 
Neal
, slip op. at 9.

Therefore, because this court's decisions apply retroactively to causes pending at the time they are announced, including cases pending on direct review, we find that 
Burgess 
is dispositive of the matter before us. See 
Neal
, slip op. at 9-11.

Here, as in 
Burgess
, 176 Ill. 2d at 299, the fitness hearing was conducted approximately one year after the defendant's trial and sentencing. More importantly, defendant's fitness at the time of trial could be fairly and accurately determined after the fact because, as in
 Burgess
, the evidence showed that the medication ingested by defendant did not have any effect on his fitness. See 
Burgess
, 176 Ill. 2d at 303-04; 
Neal
, slip op. at 11. The evidence presented, namely Dr. Thampy's testimony and the evaluations of defendant by Drs. Fautek, Henry and Thampy which were made contemporaneous to and in anticipation of the scheduled pretrial fitness hearing, compels the conclusion that defendant was suffering no impairment from the Sinequan prescribed for him during his trial and sentencing hearings.

A trial court's determination regarding fitness will not be disturbed on review unless it is against the manifest weight of the evidence. 
People v. Haynes
, 174 Ill. 2d 204, 226 (1996). In the instant case, the trial court's finding was amply supported by the record and, in accordance with 
Burgess
, the court was correct in making a retrospective determination as to whether the medication taken by defendant rendered him unfit. See 
Neal
, slip op. at 11.

Defendant contends that 
Burgess
 is distinguishable because here defense counsel failed to seek an expert witness, failed to call lay witnesses requested by defendant and was in a “thoroughly conflicted position.” However, defendant's counsel stated that he was unable to find a “professional witness” of the opinion that defendant had been unfit. Instead, counsel opted to make the legal argument that under this court's prior precedent, the failure to afford defendant a fitness hearing under section 104–21(a) before his trial and sentencing automatically entitled him to a new trial. This was a sound strategy that counsel was not ineffective for attempting because, but for the advent of 
Burgess
, it would have succeeded. See 
Neal
, slip op. at 12. Thus, no violation of defendant's right to due process or effective assistance of counsel occurred where the fitness hearing that was conducted provided an adequate procedure by which meaningful inquiry into defendant's fitness for trial and sentencing could be made.

We next address defendant's contention that his convictions for first degree murder based on an intentional or knowing state of mind (hereinafter intentional/knowing murder) (Ill. Rev. Stat. 1991, ch. 38, pars. 9–1(a)(1), (a)(2)) must be vacated because the trial court read the issues instruction for only one of the two victims to the jury and no written instruction as to either victim appears in the record. The State contends that the report of proceedings, when considered together with the common law record, indicates that the jury received a written instruction on both victims. We agree. Therefore, because the jury received written instructions, the fact that the verbal instruction was given as to only one victim is inconsequential.

Instructions on the elements of the offense charged are among those basic instructions that are essential to a fair determination of the case by the jury, and a trial court has responsibility for insuring that they are given. 
People v. Ogunsola
, 87 Ill. 2d 216, 222 (1981). Additionally, instructions to a jury in a criminal case must be written. 
People v. Moore
, 42 Ill. 2d 73, 79 (1969), 
rev'd in part on other grounds
, 408 U.S. 786, 33 L. Ed. 2d 706, 92 S. Ct. 2562 (1972).

Here, the report of proceedings shows that while a verbal issues instruction was given for intentional/knowing murder with regard to the victim Ayax Gama, the court chose not to duplicate the reading of the instruction as to the second victim, stating: “Now as to *** each victim, you will receive the following instruction. I will read the one where the named person is Ayax Gama.” After reading the instruction, Illinois Pattern Jury Instructions, Criminal, No. 7.04A (3d ed. 1992) (hereinafter IPI Criminal 3d), the court advised the jury that it would not read the corresponding issues instruction for Rafael Gama, as that instruction would differ only in that Rafael's name would be substituted for Ayax's.

The report of proceedings further reveals that, at the instruction conference, IPI Criminal 3d No. 7.04A was given twice, suggesting that a written instruction was given for each victim. The common law record, however, contains only the final two paragraphs of IPI Criminal 3d No. 7.04A as to each victim. Thus, the first page of each instruction is missing.

Where the common law record is contradicted by matters in the report of proceedings, a reviewing court must look at the record as a whole to resolve the inconsistencies. 
People v. Fike
, 117 Ill. 2d 49, 56 (1987). As a whole, the record herein indicates that the trial court promised the jury that it would receive an intentional/knowing murder instruction as to each victim; that the court thereafter read aloud, in its entirety, IPI Criminal 3d No. 7.04A; that that same instruction was listed by the court as “given” twice at the instruction conference; and that the last page of the instruction as to each victim is contained in the common law record. Given all of these facts, combined with the jury's failure to request clarification of this instruction, as would be expected if only a partial instruction were received, we are convinced that the jury was appropriately instructed in writing.

Defendant next contends that his convictions for armed robbery must be vacated because the trial court inaccurately instructed the jury on the law pertaining to those charges in response to the jury's inquiry during deliberations. Our review of the record reveals, however, that the trial court's response to the jury was appropriate and a proper statement of the law.

During its deliberations, the jury sent a note to the court which stated: “[I]n regards to the Armed Robbery charges, in the instructions, `Second: that the defendant did so by the use of force, or by threatening the imminent use of force;' Does the intent of taking ones property have to be present prior to the shooting?” The trial court sent back a note informing the jury: “You have been instructed on the applicable rules of law and you will not receive further instruction on the law. You will resume deliberations in the morning.” The following day, the court asked the jury foreman if the question had been “resolved” and the foreman indicated that it had not. After discussion with counsel for both parties, and over defense objection, the court further instructed the jury as follows: “It is not imperative that the State prove beyond a reasonable doubt that the defendant formed the criminal intent to commit armed robbery before committing murder. It is sufficient that the State proved the elements of the murder and the armed robbery was part of the same criminal episode.”

The general rule is that the trial court has a duty to provide instruction to the jury where it has posed an explicit question or requested clarification on a point of law arising from facts about which there is doubt or confusion. 
People v. Childs
, 159 Ill. 2d 217, 228-29 (1994); 
People v. Reid
, 136 Ill. 2d 27, 39 (1990). This is true even though the jury was properly instructed originally. 
Childs
, 159 Ill. 2d at 229. The trial court has a further duty to respond to the jury's request with sufficient specificity and accuracy to clarify the problem (
People v. Caballero
, 102 Ill. 2d 23, 42 (1984)), and the giving of a response which provides no answer to the particular question of law posed has been held to be prejudicial error (
Childs
, 159 Ill. 2d at 229).

In the case before us, the jury posed an explicit question which manifested juror confusion on a substantive legal issue. Specifically, the jurors wanted to know what role defendant's intent played in deciding whether the State had proven the use of force required to convict him of the armed robbery charges. Defendant contends that the trial court's response did not relay the “legal principle” that “the force used to commit [armed robbery] *** had to be accompanied by the intent to commit that crime.” However, we believe the court correctly responded that the intent to commit armed robbery need not be formulated prior to the use of force, as long as the murder and the armed robbery, 
i.e.
, the force and the taking, were “part of the same criminal episode,” 
i.e.
, concurrent.

Because the gist of armed robbery is simply the taking of another's property by force or threat of force, “proof that robbery was intended is not required to sustain a conviction for armed robbery.” 
People v. Lewis
, 165 Ill. 2d 305, 338 (1995). As this court has reasoned, “ `[i]f, as the result of a quarrel, a fight occurs in which one of the parties is overcome, and the other then, 
without having formed the intention before the fight began
, takes the money of the vanquished one, the offense committed is robbery.' (Emphasis added.)” 
Lewis
, 165 Ill. 2d at 338, quoting 
People v. Jordan
, 303 Ill. 316, 319 (1922).

Further, as long as there is some concurrence between the defendant's use or threat of force and the taking of the property, a conviction for armed robbery is proper. 
Lewis
, 165 Ill. 2d at 339, citing 
People v. Williams
, 118 Ill. 2d 407, 416 (1987). This concurrence may be established by a series of continuous acts. See 
Williams
, 118 Ill. 2d at 416. Thus, the fact that the victim had been reduced to a state of physical nonresistance 
before
 his property was taken does not relieve the crime of the quality constituting robbery. 
Jordan
, 303 Ill. at 319; see also 
People v. Strickland
, 154 Ill. 2d 489, 524 (1992). In the instant case, the trial court's instruction accurately conveyed to the jury the concurrence between defendant's use of force and the taking of the victims' property that was necessary to sustain the armed robbery convictions.

Defendant also argues that the court's response misinformed the jury that it need not find that the criminal intent to commit armed robbery preceded or accompanied the murder in order to convict for felony murder. However, we need not consider this contention because we find that defendant's convictions for felony murder must be vacated. A defendant cannot be convicted of more than one murder arising out of the same physical act; when multiple murder convictions have been entered for the same act, the less culpable convictions must be vacated and sentence imposed on the most serious offense.
 People v. Pitsonbarger
, 142 Ill. 2d 353, 377-78 (1990); see also 
People v. Cardona
, 158 Ill. 2d 403, 411 (1994). A killing that occurs when acts are performed with intent or knowledge involves a more culpable mental state than does a killing that occurs in the course of a felony. See 
Cardona
, 158 Ill. 2d at 412.

While defendant has not raised this issue on appeal, a reviewing court need not ignore grave errors of law which the parties on appeal either overlook or decline to address. See 
People v. Reddick
, 123 Ill. 2d 184, 199 (1988); 
People v. Olsewski
, 257 Ill. App. 3d 1018, 1021-22 (1994). Here, while defendant was convicted on four counts of murder, only two homicides occurred. Therefore, it is necessary that defendant's convictions for intentional/knowing murder be affirmed and that his convictions for felony murder be vacated. See
 People v. Lego
, 116 Ill. 2d 323, 344 (1987) (where judgment was entered on four murder counts and there was only one homicide, the court held that because it involves a more culpable mental state, intentional murder is a more serious crime than felony murder and therefore, upon affirming the defendant's conviction for intentional murder, the other convictions must be vacated).

We next address defendant's contention that he was deprived of a fair trial when, during the cross-examination of defense witness Ann Collins and the rebuttal testimony of State's witness Melissa Foss, the State elicited information revealing defendant's involvement in other crimes. Defendant correctly states the general rule that evidence of other crimes is not admissible if it is relevant merely to establish the defendant's propensity to commit crime. 
People v. Stewart
, 105 Ill. 2d 22, 61 (1984). The State argues that defendant has waived review of this issue because he did not make timely objections to the “other-crimes” evidence and because it was defense witness Collins who was largely responsible for injecting the error into the record. While our examination of the record reveals that defense counsel's objections were adequate to preserve the issue for review, we agree with the State that Collins voluntarily made a statement which constitutes the gist of the “other-crimes” evidence at issue.

A defendant may not be heard to complain of errors which he injected into his own trial. 
People v. Scott
, 148 Ill. 2d 479, 531 (1992). The rationale for this rule is that it would be manifestly unfair for a party to obtain a second trial on the basis of error which he injected into the proceedings. 
Ervin v. Sears, Roebuck & Co.
, 65 Ill. 2d 140, 144 (1976).

Here, Collins testified on direct examination that she had represented defendant in Judge Bolan's courtroom from 1991 until 1993. From this testimony, the jury could have concluded that Collins' representation related to the instant case. However, at the beginning of the State's cross-examination, when Collins was asked if she had ever spoken to defendant outside of the lockup, she volunteered the nonresponsive answer that she “did not represent [defendant] on the elected case.” This comment lead the jury to believe that Collins did not represent defendant in the 
instant
 case and that he therefore must have been involved in another criminal matter. While it later became clear that the “elected case” was a murder charge separate and distinct from the Gama murders, it was Collins whose extraneous answer initially injected the error alleged by defendant.

Additionally, we are unconvinced that the other-crimes evidence elicited from Collins had no relevancy except to highlight defendant's propensity to commit crime. “Evidence of other crimes is admissible if it is relevant to establish any fact material to the prosecution.” 
Stewart
, 105 Ill. 2d at 62. Here, on cross-examination, the State attempted to attack the substance of Collins' testimony, that defendant was unable to understand English, by impeaching her with certain exhibits which showed that defendant had made a statement in English to police in the matter in which she had represented him. This impeachment necessitated revealing that Collins' represented defendant in another criminal case. Thus, where defendant had made his ability to speak and understand English a question of fact which was vital to his defense, we believe the State's impeachment evidence was relevant.

 However, when other-crimes evidence is offered, the trial court must “weigh the relevance of the evidence to establish the purpose for which it is offered against the prejudicial effect the introduction of such evidence may have upon the defendant.” 
Stewart
, 105 Ill. 2d at 62. The record herein shows that, when the State began this line of questioning, defense counsel objected and the court agreed to let the prosecutor continue only after he stated that he did not intend to go into the content of the other case. Thereafter, when asked if she recalled whether defendant had made a statement in English in that case, Collins again volunteered nonresponsive information, stating that her case “was following along a murder case *** which was the elected case.” Defendant's objection to Collins' “narrative” was sustained by the trial court. Thus, where many of the details relating to the case's content were attributable to Collins and the trial court attempted to limit any undue prejudice to defendant arising from the State's use of the other-crimes evidence, we find the admission of the evidence was not an abuse of the trial court's discretion. See 
People v. Robinson
, 167 Ill. 2d 53, 63 (1995) (admissibility of other-crimes evidence rests within sound discretion of trial court and its decision will not be overturned absent a clear abuse thereof).

Defendant also contends that the rebuttal testimony of probation officer Foss was improper and unnecessary where she could have testified simply that in 1990 defendant had been a “client” of hers and that she did not accept “clients” who did not speak English. We agree. See 
People v. Andrade
, 279 Ill. App. 3d 292, 301-03 (1996) (officer's testimony improperly and unnecessarily advised jury of defendant's prior criminal activity); 
People v. Smith
, 12 Ill. App. 3d 295, 297-98 (1973) (improper testimony regarding defendant's parole violation). When evidence of other offenses is admissible for some relevant purpose, it should be confined to such details as demonstrate its relevance, and not the details of the crime. See
 People v. Butler
, 31 Ill. App. 3d 78, 80 (1975). Here, the State could have easily accomplished its purpose without referring to the fact that defendant had just been sentenced at the time Foss met him or that she had accepted him as one of her probationers.

Nevertheless, we find any error to be harmless beyond a reasonable doubt. See 
Haynes
, 174 Ill. 2d at 245-46. While the erroneous admission of other-crimes evidence carries a high risk of prejudice and ordinarily calls for reversal (
People v. Lindgren
, 79 Ill. 2d 129, 140 (1980)), the evidence must be so prejudicial as to deny the defendant a fair trial, 
i.e.
, it must have been a material factor in his conviction such that without the evidence the verdict likely would have been different. 
People v. Williams
, 161 Ill. 2d 1, 41-42 (1994). If the error is unlikely to have influenced the jury, admission will not warrant reversal. See 
People v. Wilson
, 164 Ill. 2d 436, 459 (1994).

The verdict in the instant case would not have been different without Foss' reference to defendant's probationable offense. We have established that some reference to another offense was relevant and properly offered by the State and that it was defendant, through Collins, who injected irrelevant details about that crime and a separate murder into the record. Thus, this reference to an additional crime committed by defendant was not likely to have materially influenced the jury's decision. Further, while defendant contends this error was compounded because no cautionary instruction was given to the jury, defendant, having elicited the same error, cannot claim the error was compounded when he failed to offer a limiting instruction. See 
People v. Harris
, 204 Ill. App. 3d 491, 498 (1990). Finally, the other evidence against defendant, including his confession to police, his bragging about the murders to his friend Torres, his fingerprints found at the scene and his sale of a television like the victims' shortly after the murders, established his guilt beyond a reasonable doubt. Thus, we find that defendant was not prejudiced and was not denied a fair trial.

We next address defendant's contention that his waiver of jury at sentencing was legally insufficient where the court improperly admonished him that “[t]he jury must unanimously decide 
whether
 
or not
 you are eligible” for the death sentence, and defined “unanimous” as “all people agree.” Defendant asserts that this admonishment misstated Illinois law, which mandates that a finding of noneligibility requires the vote of only one juror. See 
People v. McDonald
, 168 Ill. 2d 420, 450 (1995); 
People v. Ruiz
, 132 Ill. 2d 1, 20-21 (1989); Ill. Rev. Stat. 1991, ch. 38, par. 9–1(g). However, this issue is waived by defendant's failure to object to the admonishment and his failure to raise the issue in a post-trial motion. See 
People v. Simpson
, 172 Ill. 2d 117, 147 (1996) (both a trial objection and a written post-trial motion raising an issue are required for alleged errors that could have been raised at trial). Further, based on the unique circumstances present herein, we find the plain error rule is inapplicable.

This court has previously determined that a trial court need not inform a defendant who desires to waive jury sentencing that the death penalty cannot be imposed if a single juror opposes it. 
Ruiz
, 132 Ill. 2d at 20-21. In the case at bar, however, defendant contends the court affirmatively misinformed him that unanimity was required to find he was 
not
 death eligible. In 
People v. Morgan
, 112 Ill. 2d 111 (1986), the defendant similarly contended the trial court had erroneously advised him that the jury would have to unanimously agree 
not
 to impose the death penalty by its use, in the admonition, of the words “whether or not.”

This court reasoned as follows in 
Morgan:

“[T]he common sense reading of the admonition is that there must be a unanimous agreement by the jury `whether to' impose the death penalty. Clearly, the judge informed the defendant that unanimous agreement was required before the death penalty could be imposed. Therefore, if there was not a unanimous agreement to impose the death penalty, that penalty could not be imposed. This would seem to refute the argument that the court's admonition was to the effect that the jury also had to unanimously agree
 not
 to impose the death penalty. We are not prepared to say that the court 

erroneously advised the defendant in this regard, and 

there is nothing in the record to indicate that the defendant gained an erroneous understanding of the law from the court's statement.” (Emphasis in original.) 
Morgan
, 112 Ill. 2d at 141-42.

This reasoning applies equally to the court's admonition on death eligibility made to defendant herein. We have repeatedly held that it is sufficient, for a valid capital sentencing jury waiver, for the trial court to explain to the defendant that he is waiving the right to have a jury consider the capital sentencing issues and that the sentencing decision would, therefore, be made by the judge alone. 
People v. Brown
, 169 Ill. 2d 132, 156 (1996); 
People v. Wiley
, 165 Ill. 2d 259, 301 (1995). Based on our examination of the court's complete admonitions to defendant, which met these requirements, we do not believe he was erroneously advised.

Defendant argues that 
Morgan
 is distinguishable because there it was clear that counsel's advice, not the statements of the court, had the greatest influence on the defendant's decision (
Morgan
, 112 Ill. 2d at 141), while here the record fails to indicate that defendant was relying on his counsel's advice. However, the record reveals that not only did defendant discuss his decision to waive a jury with his attorney, but it was he who initially informed his attorney of this decision. Significantly, this decision was based neither on the admonishments of the trial court or counsel's advice, but rather on defendant's antipathy toward the jury that had convicted him and his belief that he had successfully bribed the trial judge into sparing him the death penalty.

Prior to the sentencing hearing, defendant explained that he wanted the trial court to determine his fate because the jurors “do not know much about the law,” a fact evidenced by their finding him guilty merely because he “signed papers.” Perhaps the true reason defendant wanted the trial court to sentence him was revealed at the hearing on defendant's motion to vacate the imposition of the death penalty. There, defendant stated under oath that he had paid several thousand dollars to a probation officer who assured him that she could influence the outcome of his sentencing hearing. Given these circumstances, we believe it disingenuous of defendant to contend the court's admonishments misled him or in any way affected his voluntary waiver of a jury for sentencing.

Defendant next contends that he was denied a fair sentencing hearing by the introduction of evidence that did not meet the “relevant and reliable” standard for admissibility set forth in 
People v. Free
, 94 Ill. 2d 378, 422-23 (1983). Specifically, defendant contends that Jacinto Galueras' testimony that defendant had robbed him was unreliable where the subsequent charges were dismissed upon a judicial finding of no probable cause. Further, the testimony of defendant's former employer, Daniel Gehrke, that his company had suffered three break-ins shortly after defendant's departure was unreliable because there was no evidence to connect him with two of the three incidents.

The State argues this issue is waived by defendant's failure to object to the evidence at the sentencing hearing and that no plain error occurred. We agree. Although defendant raised this issue in his post-trial motion, he waived any error in the admission of this evidence at sentencing when he failed to make a contemporaneous objection when the evidence was offered. See 
People v. Pulliam
, 176 Ill. 2d 261, 279-80 (1997); 
Simpson
, 172 Ill. 2d at 147. A defendant's waiver of a capital sentencing issue will be excused under the plain error rule where the evidence is closely balanced or where the error is of such magnitude that the defendant was denied a fair sentencing hearing. 
People v. Rissley
, 165 Ill. 2d 364, 394 (1995); 
People v. Szabo
, 94 Ill. 2d 327, 355 (1983).

The evidence at defendant's sentencing hearing was not closely balanced. Defendant executed Ayax and Rafael Gama in their own home after making them “beg for their lives,” robbed the men of their jewelry, cash, television and other belongings and then bragged about the crimes to his friend Torres. Defendant also had a history of criminal behavior which began shortly after his arrival in Chicago from Puerto Rico and which included another, yet untried, murder charge. While incarcerated, defendant engaged in disruptive and destructive behavior and was found in possession of 66 grams of marijuana and a pen knife. Defendant also threatened a guard when, on another occasion, he was found in possession of 94 grams of marijuana. Against this evidence, defendant presented testimony in mitigation that he was unwanted by his family after the death of his mother; that he was forced to live on the streets and became a drug addict, committing burglaries and selling stolen property to satisfy his addiction; and that he suffered from the HIV virus and “felt horrible” about having given this illness to his wife, Nancy. Defendant also continued to deny his culpability in the Gama brothers' murders. Thus, the evidence at defendant's sentencing hearing was not so closely balanced as to require review of defendant's claim.

The alleged error is also not of such magnitude so as to deny defendant a fair sentencing hearing. Jacinto Galueras testified to a 1989 incident in which, while he and defendant were at Galueras' house drinking, defendant suddenly struck Galueras in the head with a beer bottle, rendering him unconscious. When Galueras awoke, his money and car were gone. The parties stipulated that a judicial finding of no probable cause was later entered as to this incident. However, this court has previously determined that a finding of no probable cause does not render otherwise uncorroborated testimony inadmissible at the second phase of a capital sentencing hearing. See 
People v. Brisbon
, 106 Ill. 2d 342, 364-65 (1985) (detective's hearsay testimony as to dying victim's statement implicating defendant in his murder, for which defendant was never prosecuted, was admissible as aggravation at death penalty hearing on subsequent offense, where the evidence was relevant and reliable).

As in 
Brisbon
, the evidence herein was relevant as relating to past misconduct by defendant and the sentencing body was aware that the charge was dismissed for lack of probable cause and was able to consider this in weighing its aggravation value. Further, but unlike 
Brisbon
, defendant could test the reliability of the evidence by cross-examining Galueras, the complaining witness. Therefore, if the trial court considered Galueras' testimony in aggravation, which we find questionable given the court's comments of record, no abuse of discretion occurred where the evidence met the test for relevance and reliability. See 
Brisbon
, 106 Ill. 2d at 365.

As to the other-crimes evidence presented by Daniel Gehrke, the parties stipulated that defendant was convicted of felony theft in regard to a break-in at Balmor Manufacturing Company on July 28, 1989. However, Gehrke, an executive with Balmor, testified that the company was broken into on three occasions during the summer of 1989. A computer was stolen during each of the first two burglaries and vandalism occurred during the last. Gehrke stated that defendant had worked for Balmor until one month before these incidents began.

We agree with defendant that where no evidence was offered to connect him with the latter two break-ins, and he denied committing them, the evidence was unreliable and should not have been received. However, the sentencing court is presumed to recognize incompetent evidence and disregard it (
People v. Harris
, 129 Ill. 2d 123, 164 (1989); 
People v. Bey
, 51 Ill. 2d 262, 267 (1972)), and here, contrary to defendant's assertion, there is nothing of record which rebuts that presumption. Thus, the introduction of this other-crimes evidence, even if erroneous, did not deprive defendant of a fair sentencing hearing.

We next address defendant's claim that he was denied a fair sentencing hearing because the court, in pronouncing its lengthy findings and reasons for imposing the death penalty, made several findings which were legally or factually insupportable. Defendant specifically contends that the sentencing court erred in: (1) placing additional reliance on the aggravating factors by which it found defendant death eligible; (2) finding that an untried murder case was a capital case under two different aggravating factors; and (3) finding that defendant was a “parasite on all women” and that his behavior while incarcerated indicated that he had “no value for human life in the institution.” This issue is waived by defendant's failure to object at sentencing or raise the issue in a post-trial motion. 
People v. Beals
, 162 Ill. 2d 497, 510 (1994). Further, as noted above, the evidence at defendant's sentencing hearing was not closely balanced. However, we consider the merits of the issue to determine whether any error was of the magnitude to deny defendant a fair hearing. See 
Rissley
, 165 Ill. 2d at 394.

Our review of the record shows the first of defendant's contentions to be without merit. As the court began its “finding of facts and rulings of law,” it noted that section 9–1(b) (Ill. Rev. Stat. 1991, ch. 38, par. 9–1(b)) set forth aggravating factors which were “a prerequisite,” and further stated: “There's two murders, and there's two felony murders. Each of those factors, the jury found beyond a reasonable doubt to be the act of the defendant. Each of those factors is sufficient to meet the qualifications for the imposition of the death penalty.” It is clear that the court was simply reiterating those section 9–1(b) factors, earlier found applicable to defendant, whose purpose is to “narrow the class of persons eligible for the death penalty.” Ill. Rev. Stat. 1991, ch. 38, par. 9–1(b); see also
 People v. Hope
, 168 Ill. 2d 1, 36 (1995). The court may also have been acknowledging, correctly, that while the first stage of a death penalty hearing is a nonweighing process, the weighing and balancing of the aggravating and mitigating factors takes place at the second stage. See 
People v. Todd
, 154 Ill. 2d 57, 75 (1992); Ill. Rev. Stat. 1991, ch. 38, par. 9–1(c) (the court shall consider any aggravating and mitigating factors relevant to imposition of the death penalty; aggravating factors may include but need not be limited to those factors set forth in subsection (b)). Thus, the sentencing court, having already determined that these statutory aggravating factors existed under section 9–1(b), was statutorily authorized under section 9–1(c) to weigh the existence of those same factors in determining whether to impose the death penalty.

Defendant next argues that the sentencing court improperly considered in aggravation that a pending murder charge against him was “a capital crime.” At the sentencing hearing, Chicago Police Detective Richard Curley testified that, in January 1991, he discovered the body of Jesus Gonzalez in a junkyard. Gonzalez's hands and feet were bound and he had received gunshot wounds to the head, neck and thigh. Assistant State's Attorney Pradeep Roy-Singh testified that on February 20, 1991, defendant gave a handwritten statement regarding Gonzalez's murder. In his statement, defendant admitted that in exchange for two pounds of marijuana from his drug supplier, Gomez, he agreed to locate Gonzalez, who had allegedly stolen drugs from Gomez. Defendant enlisted the assistance of Alex Torres, promising him a pound of marijuana if he helped with Gonzalez. At Gomez instruction, defendant and Torres drove Gonzalez to a garage where defendant shot Gonzalez in the leg. Defendant and Torres then tied Gonzalez's arms and legs with an extension cord. When Gomez arrived at the garage, defendant told him that he would kill Gonzalez for another two pounds of marijuana and Gomez accepted the offer. Defendant and Torres took Gonzalez to a scrap yard, set him on the ground and shot him.

The court, in reviewing the evidence presented in aggravation at sentencing, stated that the Gonzalez homicide, a kidnapping followed by an agreement to kill a person for two pounds of marijuana, was itself:

“a capital crime under [Ill. Rev. Stat. 1991, ch. 38, par. 9–1(b)] Section 5. The defendant committed the murder pursuant to an agreement by which he was to receive *** money or anything of value in return for committing the murder, or procured another to commit the murder for money, or anything of value.

Not only did he agree to do it himself, he cut his cohort in on it, and gave him a pound of marijuana, and the defendant reduced a human life to not just two pounds of marijuana, but just one.”

The sentencing court further noted that under section 9–1(b)(11), the Gonzalez homicide was committed “in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take a human life by unlawful means.” Ill. Rev. Stat. 1991, ch. 38, par. 9–1(b)(11).

Defendant concedes that the court could consider the underlying facts of the Gonzalez homicide at sentencing herein, but argues that the court “was not permitted to rely upon statutory aggravating factors which are to be considered only in the event of a conviction.” However, we agree with the State that, when taken in the total context of the court's remarks, the reference to the statutory aggravating factors was simply part of the court's overall consideration of the factual circumstances of the Gonzalez homicide and was meant only to emphasize the seriousness of defendant's conduct and his “debasement” of human life.

“The sentencing authority is to consider `all matters reflecting upon the defendant's personality, propensities, purposes, tendencies, and indeed every aspect of his life relevant to the sentencing proceeding.' ” 
People v. Munson
, 171 Ill. 2d 158, 198 (1996), quoting 
People v. Barrow
, 133 Ill. 2d 226, 281 (1989). Additionally, the sentencer may consider any relevant aggravating factors, statutory and nonstatutory, in the process of selecting among that class of defendant who will actually be sentenced to death. 
Munson
, 171 Ill. 2d at 198. Here, when the totality of the sentencing court's comments are considered, it becomes evident that the court's reference to the statutory aggravating factors was incidental to its larger consideration of the facts surrounding the Gonzalez murder and what those facts revealed about defendant's personality and prospects for rehabilitation. Thus, we find that defendant was not deprived of a fair sentencing hearing by these references.

Finally, defendant contends that the sentencing court's comments that defendant was a “parasite on all women” and that he had “no value for human life in the institution” lacked evidentiary support. Based upon our examination of the sentencing hearing as a whole, we believe these comments were either based upon the evidence presented or were reasonable inferences therefrom. However, even if these comments were unfair characterizations, any error arising from them is harmless given our finding that the evidence at sentencing was not closely balanced. Thus, after considering each of defendant's challenges to the court's findings, we conclude that no error occurred to deprive defendant of a fair sentencing hearing.

We next consider defendant's claim that his counsel rendered ineffective assistance by his failure to contemporaneously object to and raise in a post-trial motion various of the preceding issues. Defendant's argument is without merit. “Under 
Strickland v. Washington
 (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, defense counsel is ineffective only if: (1) counsel's performance fell below an objective standard of reasonableness; and (2) counsel's error prejudiced the defendant. A court need not decide the first prong of this test, whether counsel's performance was deficient, before analyzing the prejudice component.” 
People v. Coleman
, 158 Ill. 2d 319, 349 (1994). As we have already determined in this opinion, the issues defense counsel failed to preserve are, for the most part, without merit, and did not prejudice defendant. Further, on a claim of ineffective assistance of counsel for failing to properly preserve issues for review, defendant's rights are protected by Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)), which allows a court to review unpreserved claims of plain error that could reasonably have affected the verdict. 
Coleman
, 158 Ill. 2d at 349-50.

Finally, the defendant makes several constitutional challenges to the Illinois death penalty statute, each of which has been previously rejected by this court. We decline to reconsider our previous decisions rejecting the argument that the death penalty statute violates the eighth and fourteenth amendments (U.S. Const., amends. VIII, XIV) because it places a burden of proof on the defendant which precludes meaningful consideration of mitigation evidence. See 
People v. Kitchen
, 159 Ill. 2d 1, 47 (1994); 
People v. Whitehead
, 116 Ill. 2d 425, 465 (1987). We also decline to reconsider our previous decisions rejecting the argument that the death penalty statute is unconstitutional because it allows the sentencer to weigh the “vague” aggravating factor of “[a]ny other reason” why a defendant should be sentenced to death. See 
People v. Oaks
, 169 Ill. 2d 409, 470 (1996); 
People v. Taylor
, 166 Ill. 2d 414, 439 (1995). Lastly, we decline to reconsider our previous holdings rejecting the argument that various features of our death penalty statute, considered jointly, render the statute unconstitutional. 
People v. Hobley
, 159 Ill. 2d 272, 324 (1994); 
People v. Tenner
, 157 Ill. 2d 341, 390 (1993).

For the foregoing reasons, defendant's convictions and sentences for intentional/knowing murder and armed robbery are affirmed. Defendant's convictions for felony murder are vacated. The clerk of this court is directed to enter an order setting Wednesday, May 13, 1998, as the date on which the sentence of death entered in the circuit court of Cook County is to be carried out. Defendant shall be executed in the manner provided by law. 725 ILCS 5/119–5 (West 1994). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden of Stateville Correctional Center, and the warden of the institution where defendant is confined.

Convictions affirmed in part

and vacated in part;

death sentence affirmed.

FOOTNOTES
1:
The record alternately spells this nickname “Boriqua” and “Boricua.” 

2:
Section 104–21(a) has been amended twice in recent years and no longer exists in this form. However, this court, in 
People v. Birdsall
, 172 Ill. 2d 464, 475 n.1 (1996), declined to retrospectively apply the first amended version of section 104–21(a) to a matter, such as this one, involving a direct appeal. See also 
People v. Johns
, 285 Ill. App. 3d 849, 855-56 (1996); 
People v. McKay
, 282 Ill. App. 3d 108, 115 (1996) (where a defendant's right, if any, to a fitness hearing would have accrued prior to the effective date of the amendments to section 104–21(a), section 4 of the Statute on Statutes (5 ILCS 70/4 (West 1994)) mandates that the original version of section 104–21(a) must be applied on appeal).