**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 200302-U

Order filed March 9, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
|---|---|---|
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-20-0302 Circuit No. 16-CF-2620 |
| | ) | |
| SAMUEL QUINTERO, | ) ) | Honorable Amy Bertani-Tomczak, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BRENNAN delivered the judgment of the court.
Justices McDade and Hettel concurred in the judgment.

_____

**ORDER**

¶ 1  *Held*: The trial court erred in admitting the other-crimes evidence to show *modus operandi*, but the error was harmless. Trial counsel did not render ineffective assistance when attempting to impeach the child victim with statements from her victim sensitive interview. Affirmed

¶ 2  Following a bench trial, the court convicted defendant, Samuel Quintero, of two counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40 (West 2016)) and five counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60 (West 2016)). The child victim was B.Q., defendant's biological daughter. The court sentenced defendant to six years (count I, predatory),

six years (count II, predatory), and three years (count III, aggravated, with the aggravated-criminal-sexual-abuse convictions merging into one), to be served consecutively, for a total of 15 years' imprisonment. Defendant appeals, arguing that the trial court abused its discretion in admitting other-crimes evidence and that trial counsel rendered ineffective assistance when attempting to impeach B.Q. with prior statements from her victim sensitive interview (VSI). For the reasons that follow, we affirm.

¶ 3                                I. BACKGROUND

¶ 4        The State prosecuted defendant, born in November 1984, under the theory that he sexually abused his biological daughter B.Q., born in 2002, multiple times between 2008 and 2016. According to the evidence presented at trial, the abuse occurred during defendant's weekend visitation with B.Q. B.Q. came forward after defendant told her that he wanted to have sexual intercourse with her. B.Q. was so upset by what defendant told her that she broke down at school and was taken to the counselor, at which point law enforcement was alerted.

¶ 5        The State charged defendant as follows: (1) count I, predatory criminal sexual assault of a child under 13, in that defendant placed his penis into the mouth of B.Q.; (2) count II predatory criminal sexual assault of a child under 13, in that defendant placed his finger into the vagina of B.Q.; (3) count III, aggravated criminal sexual abuse of a person under 18, in that defendant placed B.Q.'s hand on his penis in December 2016; (4) count IV, aggravated criminal sexual abuse of a person under 18, in that defendant placed B.Q.'s hand on his penis between 2014 and 2016; (5) count V, aggravated criminal sexual abuse of a person under 18, in that defendant placed B.Q.'s hand on his penis between 2013 and 2014; (6) count VI, aggravated criminal sexual abuse of a person under 18, in that defendant placed B.Q.'s hand on his penis between 2012 and 2013; and

2

(7) count VII, aggravated criminal sexual abuse of a child under 18, in that defendant placed his hand on B.Q.'s vagina between 2012 and 2016.

¶ 6                                                A. Pre-Trial

¶ 7            Prior to trial, the State moved *in limine* to introduce other-crimes evidence pertaining to six other victims. The State noted that, generally, each victim claimed that, while a teenager living in or frequenting a home in which defendant resided, defendant exposed his penis. Four of the six victims alleged that defendant forced or attempted to force them to masturbate him. None alleged that defendant made threats.

¶ 8            Relevant here, the State proffered that M.L., who was also B.Q.'s maternal aunt, would testify that, between 2005 and 2008, when she was 15 to 19 years old, defendant sexually abused her many times. The abuse occurred at M.L.'s house, which her mother owned and where defendant also lived. On "at least 20" occasions, defendant showed M.L. his penis and asked her to touch it. On "several" occasions, defendant grabbed M.L.'s hand and attempted to make her touch his penis. Her underage friends, A.A. and J.M. were present when defendant showed his penis. In addition, defendant touched M.L.'s breasts and pulled down her pants many times. Defendant often committed these acts of abuse against M.L. while M.L. was babysitting B.Q. No other adults were around.

¶ 9            The State argued that the other-crimes evidence was admissible pursuant to section 115-7.3 (725 ILCS 5/115-7.3 (West 2020)) of the Code of Criminal Procedure of 1963 (Code) to show defendant's propensity to commit a sex offense. In the alternative, the State summarily argued that the other-crimes evidence was admissible pursuant to the Illinois Rules of Evidence 404(b) (eff. Jan. 1, 2011). Rule 404(b) provides "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith except

3

as provided by sections 115-7.3, 115-7.4, and 115-20 \*\*\*. Such evidence may also be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* Another commonly invoked exception is to show *modus operandi*, which is usually linked in purpose to proving identity. See, *e.g.*, *People v. Clark*, 2015 IL App (1st) 131678, ¶ 52.

¶ 10 Defendant filed a written response, arguing that the other-crimes evidence proffered by the State did not satisfy the section 115-7.3 criteria that it be close in time and factually similar. For these same reasons, the evidence should not be admitted pursuant to Rule 404(b).

¶ 11 The trial court granted the State's motion *in limine* as to five of the six witnesses (disallowing one witness whose interview was suggestive). The court ruled that the testimony could not be used to show propensity under section 115-7.3, determining that would be too prejudicial. ("I have weighed all the factors as to the prejudicial effect and the probative value.") Nevertheless, it continued, the "proposed testimony [of the other five victims] is intertwined, it's quite similar to the allegations contained in the indictment. For th[at] reason[] I'm going to grant it [on the State's alternative, Rule 404(b) grounds] *modus operandi*, design, lack of mistake, motive, that type of evidence."

¶ 12 Defendant moved to reconsider the trial court's *in limine* ruling as to the five other victims. He essentially argued that testimony from five witnesses was excessive and that the trial court should reduce the number of witnesses and limit the number of acts to which each witness could testify. He also requested that the court provide a limiting instruction to the effect that the evidence could not be considered for propensity but only for defendant's "intent, motive, design, or knowledge."

4

¶ 13	The State responded: "I believe, the State still believes, *** that [the other-crimes evidence] should be considered to show propensity." Nevertheless, it understood that the trial court determined that the other-crimes evidence "fit under the motive, absence of mistake, and *modus operandi* umbrellas," and it respected the court's decision. Specifically, as to *modus operandi*, the State noted that defendant's pattern seemed to be that, unprompted and with great frequency, he exposed his penis and attempted to force young females in the home—often family members or close relations—to touch it. Finally, the State assured the court that the evidence concerning the charged offenses, which involved repeated abuse over an eight-year period, would be sufficiently voluminous such that the charged offenses, not the other crimes, would remain the focus of the trial.

¶ 14	The trial court denied the motion to reconsider. It ordered however, that the State limit the number of occurrences to which each witness could testify. Defense counsel offered that perhaps he could sit down with the State to discuss each witness. Counsel remarked that he hoped these issues would be sorted before the start of trial. The court agreed that that was a good plan. It also agreed that, if the case went to jury trial (which it ultimately did not), defendant was entitled to a limiting instruction that the other-crimes evidence be used only for Rule 404(b) purposes.

¶ 15	B. Trial

¶ 16	The case proceeded to a bench trial. In its opening statement, the State began by introducing B.Q. as a high-achieving teenage girl: "She's smart. She's a good daughter that anyone—any parent would be proud to call their daughter." The State then previewed the anticipated testimony, focusing on B.Q. and presenting briefer summaries regarding B.Q.'s mother and doctor. The State did remark, toward the end of its comments, that it also would be presenting

5

the testimony of two other witnesses who would testify that "similar events had happened to them" as young girls.

¶ 17    Defendant, in turn, stated that he would show that B.Q. was not a credible witness. Defendant highlighted B.Q.'s delayed outcry, the evolving nature of her account (adding more accusations with each subsequent interview), inconsistencies in her VSI and her motive to lie. Defendant argued that B.Q.'s motive to lie included anger at her father for taking away her cell phone as punishment and jealousy that her father was going to have another daughter with his new girlfriend. Defendant concluded that the State's case was weak and "I don't want the court to be focusing on the prior bad acts that you may hear to believe that he did that [to B.Q.]." Instead, he urged, "you [trial court] are going to have to base your decision on the credibility of [B.Q.]."

¶ 18                            1. The State's Case

¶ 19    In fact, the State presented just one other-crimes witness, M.L. The State's other witnesses were: B.Q.; B.Q.'s mother, Lorena Leon; and B.Q.'s examining physician, Sangita Rangala.

¶ 20    B.Q. testified that defendant abused her on multiple occasions, beginning in 2008 when she was six years old. The first incident of abuse that B.Q. could recall occurred at her maternal grandmother's house on Jasper Street, where she lived with defendant, her mother, two younger brothers, and other extended family members. B.Q. was in her brothers' room, defendant walked into the room, pulled his pants down to his ankles, and told B.Q. to put her hand on his penis. Defendant put his hand over hers and forced her to masturbate him. He used lotion, possibly Jergens brand. B.Q. cried during the act. Defendant told her not to cry. B.Q. remembered being afraid that her grandmother would find out what defendant was doing.

¶ 21    During cross-examination, defendant attempted to impeach B.Q. regarding the first incident. Defendant referred B.Q. to the VSI transcripts, which showed that B.Q. stated that she

6

"did not know" what defendant made her do and that the lotion brand was possibly Geraldines, not Jergens. On re-direct, B.Q. explained that she stated that she "did not know," because she was unsure how to describe the act. She maintained that defendant forced her to masturbate him. Defense counsel objected, unsuccessfully, to the State's reading of B.Q.'s complete VSI statement on redirect concerning forced masturbation.

¶ 22       B.Q. also testified to subsequent incidents of abuse, which occurred between 2008 and 2016 at her paternal grandmother's house on Eastern Street, where she and her brothers visited defendant each weekend after defendant's breakup with B.Q.'s mother. Extended family members lived in the home, and sleeping arrangements differed depending on who else lived in the home at a given point in time. Defendant also had two live-in girlfriends at various times, first a woman by the name of Megan and then, beginning in 2015, Maria Conejo.

¶ 23       The abuse occurred, on average, every other weekend. The abuse varied depending on sleeping arrangements and who else lived in the house. The abuse occurred less frequently when Megan lived in the house. The frequency of abuse did not change when Conejo was in the house. Defendant was more likely to force B.Q. to perform oral sex when B.Q. had her own room. Defendant would make B.Q. "eat" his sperm. Defendant continued to abuse B.Q. even when she shared a room with her brothers. Defendant would look at B.Q.'s brothers to ensure they were asleep. Defendant would then force B.Q. to perform various sex acts, such as masturbating him. Sometimes, B.Q. awoke to find that her hand was already on defendant's penis. On at least one other occasion, she awoke to find that defendant's finger was in her vagina. Defendant would stop when she started crying.

¶ 24　　　　During the same period, defendant touched B.Q.'s breasts and butt outside her clothing when other people were home but not in the room. Defendant never threatened B.Q., but he would tell her to be quiet, to stop crying, and not to tell anyone.

¶ 25　　　　During cross-examination, defendant attempted to impeach B.Q. regarding the frequency with which defendant abused her. B.Q. initially stated in the VSI that defendant touched her nearly every night. However, B.Q. explained she meant that defendant abused her nearly every night that she stayed at his house (or nearly every other night that she stayed at his house). Defendant also attempted to impeach B.Q. regarding the oral-sex allegation. B.Q. agreed that she never broached the oral-sex allegation until prompted by the VSI interviewer. (The interviewer asked B.Q. whether defendant had ever put his penis anywhere else, presumably anywhere other than her hand or against her leg as she had earlier disclosed, after which B.Q. disclosed that he had also put his penis in her mouth.) Finally, defendant attempted to impeach B.Q. regarding incidents when defendant placed his finger in her vagina. B.Q. stated in the VSI that she "did not know" how it felt when defendant placed his finger in her vagina. However, B.Q. explained that she meant that it was difficult to talk about.

¶ 26　　　　B.Q. testified to the last incident of abuse on December 11, 2016, which occurred as defendant drove B.Q. to a party. The drive was 20 minutes. At the first red light, defendant put his hand through a hole in B.Q.'s jeans. Defendant attempted to move his hand closer to B.Q.'s vagina. B.Q. moved his hand away. This occurred several times. Half-way through the drive, defendant unzipped his pants and began to masturbate. Defendant attempted to put B.Q.'s hand on his penis, but B.Q. was able to resist such that only the back of her hand touched his penis. Defendant then apologized to B.Q. Defendant told her that he could not control himself and, for some time, he had wanted to have sexual intercourse with her.

8

¶ 27 During cross-examination, defendant impeached B.Q. with her statement to the police that she was able to pull her hand away without touching defendant's penis during the December 11 car incident. However, B.Q. explained she meant that the front of her hand did not touch defendant's penis, and she persisted that the back of her hand touched his penis.

¶ 28 Finally, B.Q. testified to her motives in coming forward. When defendant told B.Q. that he wanted to have sexual intercourse with her, she was afraid that he might go through with it. B.Q., a straight-A student with no disciplinary history, was very upset at school the next day. A friend asked B.Q. what was wrong, and she began to cry. A lunch lady took B.Q. to the school counselor. B.Q. had not come forward earlier because defendant had promised to stop, she did not want to jeopardize the child support that defendant paid her mother, she did not want to hurt her mother, and she did not want her younger brothers to lose their father.

¶ 29 During cross-examination, B.Q. denied that she was motivated by anger toward defendant for taking her cell phone. In fact, she clarified that defendant did not take her phone until December 18, 2016, after she had disclosed the abuse. B.Q. also denied that she was motivated by jealousy in that defendant and Coneja were going to have a baby daughter and, possibly, move to Texas.

¶ 30 M.L., B.Q.'s maternal aunt, testified that defendant committed sexual acts against her many times between 2005 and 2006. In 2005, M.L. was 16 years old, and she happened to be pregnant. The acts occurred at her mother's house on Jasper Street, where she lived with her mother, B.Q.'s mother (her sister), defendant, B.Q., and, later, B.Q.'s younger brothers and her own daughter.

¶ 31 According to M.L., defendant intermittently committed sexual acts against her: "It really didn't stop. *** I am sorry. It would stop from time to time, but it would keep on happening." M.L. testified to the type of sexual acts:

"Q. What was one thing that made you upset or uncomfortable?

A. One of the main ones, him trying to force me to touch his penis.

\*\*\*

A. He would grab my hand and place it on his penis forcing me.

\*\*\*

Q. And when he would do that, would it be above his clothes or under his clothes?

A. It would depend. Sometimes underneath or he would just—how should I say, stick it out.

\*\*\*

Q. Okay. So would it be his bare-skinned penis at that point?

A. Yes.

\*\*\*

Q. \*\*\* [W]hen he would try to get you to touch his penis, was anybody else in the same room or was it just the two of you?

A. Just the two of us."

¶ 32    Additionally, when alone, defendant tried to touch M.L.'s breasts and butt and tried to take off her shirt. On at least one occasion, defendant attempted to rub his exposed penis on her butt (over her clothes). Defendant committed different acts when M.L.'s friends also were in the room. Specifically, defendant occasionally "st[u]ck out his penis, just to show us."

¶ 33    M.L. told defendant to stop, warning him that her sister (defendant's romantic partner and B.Q.'s mother) was going to "find out." Defendant would respond that "he wasn't going to do

10

anything to me, that he was just horny, he was just playing around, or beg me not to say anything."

M.L. told her sister about defendant's acts after defendant moved out of the house in 2009.

¶ 34    During cross-examination, defendant impeached M.L. with her earlier statement to police that she had never told her sister what defendant was doing. She explained the discrepancy by stating that she meant that she did not tell her sister until after defendant moved out of the house in 2009. M.L. also acknowledged that she told the police that she never touched defendant, but she meant that she never touched him willingly:

"Q. Officer asked you, how many times would he try to touch you or have you touch him. Do you recall that question?

A. Yes. I do.

Q. You answer was, I never touched him?

A. I never touched him willingly. He forced me to touch him.

Q. That's not what I asked you. Your answer was, I never touched him, correct?

A. Yeah, that's what I said."

¶ 35    M.L. was not concerned at the time that defendant would abuse B.Q. On re-direct examination, M.L. further stated as to B.Q.: "I didn't think he was going to go that far. I thought it was just me not his daughter."

¶ 36    M.L. did not testify that defendant abused her while she was babysitting B.Q., unlike what was set forth in the motion *in limine*. Contrary to the State's proffer during the motion in *limine*, M.L. affirmatively stated that defendant never took off her pants.

¶ 37    B.Q.'s mother, Leon, testified that, after she and defendant ended their relationship, defendant moved out of her mother's house on Jasper Street and into his mother's house on Eastern Street. Defendant had visitation with the children at his mother's house on Eastern Street. On

11

December 12, 2016, B.Q.'s school notified Leon about the alleged abuse. Prior to that, Leon had no indication that defendant was abusing B.Q. B.Q. did well in school and had no behavioral issues. B.Q. typically confided in Leon about matters, and B.Q. did not tell Leon that defendant was abusing her. Leon did occasionally observe B.Q. crying after visits with defendant, but Leon acknowledged that, when she spoke to police on December 12, 2016, she did not tell police about these observations. Nor had Leon told case workers that B.Q. cried after visits with her father. Leon further testified that B.Q. was "distant" after visits with defendant, but B.Q. was "always" distant, so this did not alarm her. Leon had a conversation with her sister, M.L., about inappropriate actions defendant had taken toward M.L. However, Leon did not specify when this conversation took place.

¶ 38        Sangita Rangala testified as an expert in medical evaluations and treatment for pediatric abuse. Rangala examined B.Q. on January 12, 2017. She noted that, even in cases with some penetration, 99% of victims show no physical evidence of sexual abuse after 72 hours. Here, as B.Q. had not alleged that any penetration had occurred in the prior 72 hours, Rangala expected to see "normal" exam results. B.Q.'s exam results were normal and there was no physical evidence of sexual abuse.

¶ 39                              2. Defendant's Case

¶ 40        Defendant presented two witnesses: Betriz Guerra and Maria Conejo. Guerra, defendant's half-sister, testified that she witnessed B.Q. go from being a normal child to a moody child upon learning that Conejo was pregnant with defendant's baby. On one occasion, Guerra asked B.Q. why she was mad, but B.Q. did not respond. Guerra acknowledged that she did not live with defendant or B.Q. but that she visited once or twice per month.

12

¶ 41    Conejo, defendant's girlfriend, testified that she lived in the house with defendant and B.Q. She was certain that defendant was never alone with B.Q. in the middle of the night. When defendant left the bedroom, she heard his footsteps reach the bathroom, which was in the opposite direction of B.Q.'s room. Defendant would be gone no longer than necessary to use the bathroom. Conejo acknowledged that she worked from 7 a.m. to 5:30 p.m. every Saturday, Sunday, and Monday, and, thus, she was not present during a large portion of B.Q.'s weekend visits. Nevertheless, Conejo maintained that defendant was "never" left alone with B.Q. B.Q. began to distance herself from Conejo upon learning that Conejo was pregnant. When defendant told B.Q., in December 2015, that he and Conejo were going to have a baby girl, B.Q. became angry and attempted to hit defendant. B.Q. screamed and said, "why," as defendant had told her in the past that he would not have any more children. Also, B.Q. became upset when, in late December 2016, defendant and Conejo informed B.Q. that they were going to move to Texas. She asked him why he had the right to move to a different state when her mother had not been allowed to move to a different state. Conejo was "sure" of the timing.

¶ 42    On cross-examination, the State confirmed that, in December 2015, Conejo was just one month into her pregnancy. Conejo conceded that, at that point, she did not know her baby's gender and could not have told B.Q. she was having a girl. At the same time, she maintained that the conversation regarding the new baby had taken place in December 2015, and there had been only one conversation.

¶ 43                        3. Closing Argument and the Trial Court's Ruling

¶ 44    The parties proceeded to closing argument. The State began by recounting the elements of the offense as satisfied by B.Q.'s testimony. This accounted for 14 of the 19 pages of the State's opening-close transcript. The State argued that B.Q. was credible: "The timing of the outcry makes

13

sense"; "Now, the conduct complained of by [B.Q.] has been consistent"; and "Although there may be minor inconsistencies over the *** different recitations, the sum and substance has remained constant." The State next focused on the improbability of defendant's explanation of why B.Q. would lie: anger over a cell phone and jealousy over a new daughter. This roughly covered the next 5 pages of transcript. In 19 pages of transcript, the State made a single reference to M.L.'s testimony, noting: "Now [B.Q.] also testified that the defendant through all the relevant times would frequently grab her buttocks and breasts over her clothes during the day when no one else was present in the room, and this is consistent with what her aunt [M.L.] testified to regarding the defendant's conduct towards her. [M.L.] stated that the defendant frequently grabbed her breasts and buttocks when others were home, but not in the same room."

¶ 45    Defense counsel in closing responded by stating: "Now, one thing I would agree with the State *** [is that] [t]his case is going to come down to the credibility of B.Q." In keeping with its position, counsel then spent the majority of his closing argument pointing to inconsistencies in B.Q.'s VSI. Counsel briefly referenced M.L.'s testimony, noting that she had been impeached with her police interview (on the issue of touching the penis) and, therefore, did not add to the State's case against defendant.

¶ 46    The State argued in rebuttal: "As everyone has stated here today, no matter what you believe of [Conejo] and [M.L] and Dr. Rangala and whoever else was up there, this trial comes down to, pretty simply, if you believe [B.Q.] or not." It urged: "[B.Q.] herself has proven not only beyond a reasonable doubt, but beyond any doubt that this man has committed [the charged offenses] with her for eight years of her life. She is an amazing, strong, bright young woman who deserves justice ***." In contrast, the State continued, defendant's theory of the case, as testified to by Conejo, was implausible.

14

¶ 47    The State further asserted that defendant had overstated certain inconsistencies in B.Q.'s VSI.  Defense counsel interjected:

"DEFENSE COUNSEL: And Judge, just for the record, I know we have been quoting the VSI.  I have no objection when your honor goes back to deliberate, since we quoted so many pages, if you take that back.

THE COURT: Okay.  Because that's one thing I do not have.  ***.

DEFENSE COUNSEL: You don't have the full VSI, and I think the State is saying I misquoted.  I think they're doing the same.  It's just better that you have it.

THE COURT: Okay.  If nobody has any objection to that, I will review that again too[.]

DEFENSE COUNSEL: Judge, just so the Court knows that we, I think, agree you either can have the video or the actually transcribed—if both parties agree to the transcription.

THE COURT: I'd rather have the transcription."

After listening to the entire rebuttal, however, the court stated: "I change[d] my mind.  I want the VSI, the actual tape *** I will just take the VSI tape.  *** I don't need the transcript."  The court also commented that it had the transcripts from B.Q.'s testimony, but it did not have the transcripts of any other witness.  The parties then suggested that the court take Conejo's transcribed testimony and the stipulations by the police officers.  The parties did not offer to provide the court with M.L.'s transcribed testimony.  The court took the matter under advisement.

¶ 48    In its oral ruling finding defendant guilty, the trial court noted that it found B.Q. testified credibly, providing details to the best of her ability regarding time and place.  The court found that B.Q. reasonably explained any minor inconsistencies in her prior statements.  The court did not

15

reference any other witness. It concluded: "And as all the parties have argued in court on this case is that it comes down to the credibility of [B.Q.], and I find that the State has sustained their burden of proof, that [B.Q.'s] testimony was credible."

¶ 49　　Defendant filed a written motion for a new trial, arguing, *inter alia*, that the trial court erred in admitting other-crimes evidence. Defendant again presented a section 115-7.3 propensity argument, even though the trial court had stated that it would not consider the evidence for propensity. He also argued that the trial court's decision to admit multiple other-crimes witnesses influenced his decision to forego a jury trial.

¶ 50　　At the hearing on the motion, defendant limited his argument to the sufficiency of the evidence, arguing that B.Q. was not credible. The trial court denied the motion. This timely appeal followed.

¶ 51　　　　　　　　　　　　　　II. ANALYSIS

¶ 52　　Defendant argues that the trial court abused its discretion in admitting other-crimes evidence and that trial counsel rendered ineffective assistance when attempting to impeach B.Q. with her prior statements from the VSI. While we agree that the trial court erred in allowing the other-crimes evidence based upon the articulated exceptions, the error was harmless. Moreover, trial counsel did not render ineffective assistance when attempting to impeach B.Q. with her prior statements from the VSI.

¶ 53　　　　　　　　　　　　A. Other-Crimes Evidence

¶ 54　　Defendant argues that the trial court abused its discretion in allowing M.L. to testify to other-crimes evidence. He notes that the general rule is to exclude other-crimes evidence, and he contends that none of the generally recognized exceptions to the rule—*modus operandi*, common plan or scheme, intent, absence of mistake, or motive—apply. In addition, defendant notes, the

16

trial court had already ruled that introducing M.L.'s testimony under section 115-7.3 to show propensity would be too prejudicial. The State responds that M.L.'s testimony was admissible under the *modus operandi* exception. We review a trial court's decision to admit other-crimes evidence for an abuse of discretion. *People v. Pikes*, 2013 IL 115171, ¶ 12. A court abuses its discretion when its decision is arbitrary, fanciful, or unreasonable. *People v. Donoho*, 204 Ill. 2d 159, 182 (2003).

¶ 55　　　　Other-crimes evidence is generally inadmissible because a defendant is entitled to have his guilt or innocence determined solely with reference to the charged offense. *People v. Gregory*, 22 Ill. 2d 601, 603 (1961). Admitting other-crimes evidence presents a risk that the trier of fact will convict a defendant not with reference to the charged offense but because it believes the defendant to be a bad person deserving of punishment. *Donoho*, 204 Ill. 2d at 170. The common law, however, has long recognized various exceptions to the rule against other-crimes evidence. *Id*. (citing *People v. Illgen*, 145 Ill. 2d 353, 364-65 (1991)). The classic exceptions include *modus operandi*, common plan or scheme, motive, intent, absence of mistake, and any material fact other than propensity. *Id*. Additionally, as pertinent here, the legislature enacted section 115-7.3 in 1997 to allow other-crimes evidence to show a defendant's propensity to commit a sex offense, provided certain statutory requirements were met. Pub. Act 90-132 (eff. Jan. 1, 1998) (enacting 725 ILCS 5/115-7.3); *Donoho*, 204 Ill. 2d at 176.

¶ 56　　　　In this case, having denied the State's request to admit the other-crimes evidence under section 115-7.3 to show propensity on prejudice grounds, the trial court proceeded to admit the evidence to show "*modus operandi*, [common] design, lack of mistake, motive, that type of evidence." However, as defendant observes, the generally recognized exceptions to the rule against other-crimes evidence are not, categorically, "that type of evidence," in the sense the

17

exceptions are not interchangeable with one another. See *People v. Kimbrough*, 138 Ill. App. 3d 481, 486 (1985) (with regard to *modus operandi* versus common design). Each exception is distinct with different supporting rationales. *Id.* The State should be careful not to file boilerplate other-crimes motions urging inapplicable bases for admission; trial courts should consider each exception independently, rather than address them together without concern for their varying underpinnings. Though the State argues forfeiture based on defendant's generic response to its motion *in limine*, we decline to apply the doctrine where the State lacked precision in framing the issue.

¶ 57    On appeal, the State focuses exclusively on the *modus operandi* exception and does not address the relevance of the trial court's other stated bases for allowing the other-crimes evidence, such as common design or scheme, motive, intent, or absence of mistake. Nevertheless, we briefly reject the applicability of those exceptions before turning to the *modus operandi* exception. Common design or scheme is not relevant, because that exception applies when the defendant has engaged in a criminal scheme of which the crime charged is only a part. See *id.* at 486. Motive does not apply, because the other crimes against M.L. did not serve as the motive behind the crime charged. *People v. Lenley*, 345 Ill. App. 3d 399, 407 (2003). Intent and absence of mistake are not applicable, because defendant neither admits the physical acts supporting the charges while contending that he did not intend sexual gratification, nor argues that the touching was accidental. See *Clark*, 2015 IL App (1st) 131678, ¶ 32; *People v. Woltz*, 228 Ill. App. 3d 670, 674 (1992); *cf. People v. Wilson*, 214 Ill. 2d 127, 137-38 (2006) (declining to address whether other-crimes evidence can *ever* be used to show intent where the defendant does not place intent at issue).

¶ 58    Turning to the exception urged by the State on appeal, we note initially that *modus operandi* is most commonly used to establish identity. *Clark*, 2015 IL App (1st) 131678, ¶ 52. *Modus*

18

*operandi* has been defined as " 'method of working.' " *People v. Bullock*, 154 Ill. App. 3d 266, 269 (1987) (quoting *Kimbrough*, 138 Ill. App. 3d at 486). While the *modus operandi* exception recognizes that there will always be some differences between independent crimes (*People v. Phillips*, 127 Ill. 2d 499, 521 (1989)), it nevertheless requires a higher degree of similarity between the other crimes and the charged offense than any other generally recognized exception. *People v. Cruz*, 162 Ill. 2d 314, 349 (1994). This is because the *modus operandi* theory relies "on an inference that a distinctive pattern of criminal activity earmarks the crimes as the work of a particular individual or group." *People v. Robinson*, 167 Ill. 2d 53, 65 (1995). It refers to a pattern of criminal behavior so peculiar and distinctive that separate crimes are recognizable as the handiwork of the same person. *Bullock*, 154 Ill. App. 3d at 269 (quoting *Kimbrough*, 138 Ill. App. 3d at 486). " 'If evidence of other crimes is offered to prove *modus operandi*, there must be some clear connection between the other crime and the crime charged which creates the logical inference that if [the] defendant committed one of the acts, he may have committed the other act.' " *Id*. This inference of identity, as established by a signature method, cannot arise when the similarities between the charged offenses and the other-crimes evidence amount to little more than conduct constituting the elements of the respective offenses or are shared by numerous distinct crimes of a certain class committed by persons other than defendant. *Kimbrough*, 138 Ill. App. 3d at 486; see also *Woltz*, 228 Ill. App. 3d at 675.

¶ 59        While the State acknowledges that identity was not an issue here, it directs us to a line of cases where other-crimes evidence was admitted as *modus operandi* to establish that a crime occurred in the first place. See *People v. Middleton*, 38 Ill. App. 3d 984 (1976); *People v. Fuller*, 117 Ill. App. 3d 1026 (1983); *People v. Pitts*, 299 Ill. App. 3d 469 (1998). This line of cases recognizes that, while *modus operandi* is typically used to establish identity, it can also be used to

19

show that a crime was committed. *Middleton*, 38 Ill. App. 3d at 990. In circumstances where a defendant admits to interacting with the victim but denies that any crime took place, the State, in turn, may use the other-crimes evidence show a criminal pattern that is peculiar, distinctive, and so similar to the charged offense as to establish that the crime took place. To our research, this variation of the *modus operandi* exception most often has been applied in sex-crime cases. In *Fuller*, 117 Ill. App. 3d at 1034, the court expressly noted that evidence of *modus operandi* may be admissible in prosecutions for sex offenses even where the identity of the accused is not in dispute.

¶ 60      Briefly, in *Middleton*, the defendant, a medical doctor, was alleged to have drugged a female patient before committing deviate sexual assault during a gynecological exam. *Middleton*, 38 Ill. App. 3d at 986-87. Six other-crimes witnesses testified to striking similarities in the manner that they, too, were assaulted by the doctor, including identical side effects from the drugs and being asked inappropriate questions about their sex lives. *Id.* at 987. The appellate court ruled that the other-crimes evidence was properly admitted under the *modus operandi* exception: "[T]he testimony of the complainant and the six other patients share sufficient peculiar and distinctive features to demonstrate the defendant's *modus operandi*[.] *** The striking similarity of the acts testified to lends credence to the complainant's allegations, which might otherwise seem implausible." (Internal quotation marks omitted.) *Id*. at 989.

¶ 61      In *Fuller*, defendants, a husband-and-wife pair, were alleged to have committed rape and deviate sexual assault in that they lured a young woman into their home under the guise of an interview for domestic employment. *Fuller*, 117 Ill. App. 3d at 1029. Two other-crimes witnesses testified to the same pattern of assault, including that they were young women who answered "virtually identical" newspaper advertisements placed by the wife under her maiden name; the

20

defendants drove a long distance to bring them to their home for an interview; they were served alcoholic drinks that made them lightheaded (beyond the effects of an ordinary alcoholic beverage); the husband began with a conversation of his educational background before turning the subject to sex; the defendants showed the girls pornographic movies and/or magazines; the wife excused herself and then rejoined the group in the nude; the husband used the same words to try to persuade the women not to resist his advances; and the wife directly participated in the sexual assault of one of the other victims. *Id.* at 1035. The appellate court ruled that the other-crimes evidence was properly admitted under the *modus operandi* exception: "[T]hese other offenses *** shared peculiar and distinctive common features which tended to establish *** the same *modus operandi*. *** Th[is] striking similarity *** was relevant to the issue of whether a crime was actually committed." *Id.* at 1035-36.

¶ 62        Clearly, the instant facts nowhere near approximate the peculiar and distinctive other-crimes evidence in *Middleton* and *Fuller* that were recognizable as the handiwork of the same person. In seeming acknowledgment that the degree of similarity present in *Middleton* and *Fuller* far exceeds that present here, the State focuses on *Pitts*.

¶ 63        In *Pitts*, defendant was alleged to have sexually assaulted the 8- and 13-year-old daughters of his girlfriend. *Pitts*, 299 Ill. App. 3d at 472. One other-crimes witness testified to a similar pattern of assault when she was the 13-year-old daughter of another of defendant's girlfriends. *Id.* at 475. She testified to other similarities, including that defendant lured the girls to be alone with him at night by asking them to do a chore; lay on top of them; digitally penetrated them; and threatened to kill them if they told. *Id.* The appellate court ruled that the other-crimes evidence was properly admitted under the *modus operandi* exception: "[T]he earlier crime *** and the

21

[charged crimes] share distinctive common features so as to earmark all the acts as the handiwork of the same person." *Id.*

¶ 64    Initially we note that *Pitts* is an outlier to the extent it approved of *modus operandi* evidence without the peculiar and distinctive evidence required in *Middleton* and *Fuller* to support the admission of other-crimes evidence under that exception. The similarity of targeting the young daughter of a friend or girlfriend in *Pitts* is, unfortunately, not particularly distinctive in crimes of this class. This point was made by the *Woltz* court. *Woltz*, 228 Ill. App. 3d at 676 (that both victims were young girls who were acquainted with the defendant prior to the attack was "common to many offenses of this type"). The similarity of digital penetration, too, simply amounts to an element of offense that is, unfortunately, not unique. *Id.* (that some force was used in both attacks and both victims had their sexual organs penetrated by a part of the defendant's body was merely descriptive of the crime of aggravated criminal sexual assault). In *Pitts*, the distinctive act of asking both children to perform a chore to get them alone was essentially the only "hallmark" evidence supporting *modus operandi* other-crimes evidence.

¶ 65    In any event, even if *Pitts* were not an outlier, we determine that the degree of similarity between defendant's acts against B.Q. and those against M.L. falls short of the degree of similarity shown even in *Pitts*. There is no instance of defendant using a distinctive technique—in *Pitts*, chores—to lure his victims. The other similarities (related victims; similar, but not uncommon, sexual acts committed in defendant's residence; and defendant's exposure of his penis to M.L. and her friends), while arguably sufficient to meet the prerequisites for section 115-7.3 other-crimes evidence, are too generic to qualify for the *modus operandi* exception.

22

¶ 66        Having concluded that the introduction of the M.L. other-crimes evidence was error, we consider whether M.L.'s testimony unduly prejudiced defendant; for the reasons that follow, we determine that it did not.

¶ 67        Ordinarily, the erroneous admission of other-crimes evidence carries a high risk of prejudice and calls for the reversal of a criminal conviction. *People v. Cortes*, 181 Ill. 2d 249, 285 (1998). Reversal is not automatic, however. See *id*. The following harmless-error test applies to the erroneous admission of other-crimes evidence: "the evidence must be so prejudicial as to deny the defendant a fair trial, *i.e.*, it must have been a material factor in his conviction such that without the evidence the verdict likely would have been different. *** If the error is unlikely to have influenced the jury, admission will not warrant reversal." *Id.*

¶ 68        In a bench trial, the record may afford the appellate court greater insight into what evidence, exactly, influenced the trier-of-fact. Following a bench trial, the trial judge often states for the record the evidence relied upon in reaching its decision. The same cannot be said for a jury trial where, absent a special interrogatory, the record provides little or no insight into what evidence influenced the jury's verdict. See *People v. Caguana*, 2020 IL App (1st) 180006, ¶ 37 (a court may not probe the jury's actual thought process).

¶ 69        Here, as we have discussed, the parties focused their closing argument on B.Q.'s credibility. The State made a fleeting reference to M.L.'s testimony, mentioning only defendant's act of touching M.L. outside her clothing and ignoring M.L.'s impeached testimony regarding touching defendant's penis. Similarly, the trial court, in taking the matter under advisement, indicated that it would be considering B.Q.'s transcripts (as potentially impeached by the VSI), Conejo's transcripts, and the officers' stipulations. The court stated that it did not have the other witnesses' transcripts. Thus, when the trial court later announced in its oral ruling that it had relied,

23

in part, on its review of the transcripts in reaching its decision, we know that it did not mean the transcripts of M.L.'s testimony. Indeed, in its ruling finding defendant guilty, the trial court never referenced M.L.'s testimony.

¶ 70 Rather, the trial court expressly stated that its guilty finding was based on B.Q.'s credibility. As such, unlike where the fact-finder is a jury and no information is available to understand the verdict, we can be reasonably certain that M.L.'s testimony was not a material factor in the trial court's guilty determination.

¶ 71 Other indications of prejudice are also lacking. The other-crimes evidence was not the focal point of the trial. *Cf. People v. Richee*, 355 Ill. App. 3d 43, 58-59 (2005) (the presentation of the other-crimes evidence was highly detailed and excessive). While the trial court allowed five other-crimes witnesses, the State presented only one, minimizing the potential for prejudice. See, *e.g.*, *People v. Johnson*, 406 Ill. App. 3d 805, 810-11 (2010) (the State's decision to reduce the allowed witnesses from three to one reduced the potential for prejudice). As discussed, the State referenced M.L.'s testimony only briefly in opening and closing statements, see, *e.g.*, *id.* at 819, and, in closing argument, abandoned what it had previously advocated as the most compelling similarity between the charged and uncharged crimes—the touching of the penis.

¶ 72 Further, we observe that the record supports the trial court's assessment that B.Q. was credible. She testified that she is a senior in high school and a straight-A student with no disciplinary history. She further testified to the acts defendant committed against her, that defendant digitally penetrated her, forced her to perform oral sex, and masturbate him. She described the locations where these events occurred, noting that, occasionally, her brothers were asleep in the room. The trial court disagreed with defendant that the evolution of B.Q.'s claim— beginning with telling the school counselor of the precipitating December 2016 incident in the car

24

and ending with telling the VSI interviewer about that incident plus prior incidents over the years—undermined her credibility. Although B.Q.'s disclosures became more detailed over time, there were no significant inconsistencies. Indeed, defendant virtually concedes this point in his ineffective-assistance argument by contending that trial counsel's effort to impeach B.Q. only served to highlight the strength of her testimony.

¶ 73       In contrast, defendant's evidence in support of his theory that B.Q. had a motive to lie was problematic. A defendant is not required to prove his innocence, but, when a defendant chooses to put forth an implausible explanation, that may be counted against him. See, *e.g.*, *People v. Lester*, 145 Ill. App. 3d 720, 738 (1986) ("When the defendant elects to explain the circumstances, he is bound to tell a reasonable story or be judged by its improbabilities and inconsistencies"). Defendant's explanations for why his daughter accused him of committing serious crimes were inherently implausible. First, defendant argued that B.Q. lied because he took away her cell phone as a punishment. B.Q. later clarified that her phone was not taken away until *after* she had made the initial disclosure. Next, defendant argued that B.Q. lied because she was jealous that he was going to have a baby daughter. However, the State significantly impeached defendant's witness, Conejo, who testified in support of this theory. Even when given an opportunity to correct herself, the timing did not track. Conejo could not have known the gender of her child one month into conception. Also, if Conejo was correct that the Texas discussion took place in late December 2016, a time of which she was "sure," the discussion would have occurred after B.Q.'s outcry and, thus, would have been of no import. Conejo was also impeached on her assertion that defendant was never left alone with B.Q. Conejo worked during the day during B.Q.'s weekend visits, so Conejo lacked the knowledge to testify that defendant was never alone with B.Q.

25

¶ 74　　　　　We recognize that appellate courts have been reluctant to find harmless error where the evidence is purely circumstantial or where the case turns on witness credibility. See *Richee*, 355 Ill. App. 3d at 60-61 (improperly admitted other-crimes evidence cannot be harmless error in purely circumstantial cases); *Woltz*, 228 Ill. App. 3d at 676 (credibility); *cf.* 3 Illinois Evidence Manual §20:20 (4th ed.) (questioning the *Richee* court's edict as overbroad in that it categorically deems circumstantial evidence suspect). Here, however, the evidence was not purely circumstantial; B.Q. testified as an occurrence witness against defendant. Also, on the question of credibility, we have the benefit of the trial court's express statement that B.Q. was credible. While the trial court did not revisit its ruling on the motion *in limine*, the parties did not include M.L.'s transcript as the court headed into deliberation. The parties did not argue, nor did the court verbalize, that the other-crimes evidence was material to the case. Significantly, in finding B.Q. credible, the trial court recounted the details of B.Q.'s testimony and did not reference M.L. Thus, we determine that M.L.'s testimony was not a material factor in defendant's conviction. Even without M.L.'s testimony, there is no reasonable likelihood that defendant would have been acquitted. As such, a new trial is not warranted.

¶ 75　　　　　　　　　　　　　　B. Ineffective Assistance

¶ 76　　　　　Defendant next argues that trial counsel rendered ineffective assistance when attempting to impeach B.Q. with prior statements from her VSI. Defendant contends that counsel overestimated the impeachment value of the VSI statements and was unaware that doing so opened the door for the State to rehabilitate B.Q. with other statements from the VSI, thus serving to highlight B.Q.'s strength as a witness. Defendant urges that counsel compounded the error by allowing the trial court to view the DVD recording of the VSI, which was just over 40 minutes long and had not been played or admitted at trial, as opposed to limiting its consideration to the

transcripts of the VSI. Thus, we are called upon to consider two actions by defense counsel: the use of the VSI to impeach B.Q. at all, and the introduction of the video to support the impeachment. We view the trial court's acceptance of the parties' offer to view the DVD recording as the *de facto* re-opening of the proofs, by agreement, to allow the court to consider impeachment evidence. For the reasons that follow, we determine that counsel's actions were a matter of trial strategy that did not prejudice defendant.

¶ 77 To prevail on an ineffective-assistance-of-counsel claim, a defendant must show (1) deficient performance, in that counsel's performance fell below an objective standard of reasonableness; and (2) prejudice, in that a reasonable probability exists that, but for counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 691-92 (1984). Under the performance prong, we begin with the presumption that counsel was competent and that the complained of action was one of trial strategy. *People v. Coleman*, 183 Ill. 2d 366, 397 (1998). A particular strategy is not unreasonable simply because it proves unsuccessful. *People v. Peterson*, 2017 IL 120331, ¶ 88. Defendant must show that the errors were so serious that counsel was not functioning as the counsel guaranteed by the sixth amendment. *Coleman*, 183 Ill. 2d at 397-98.

¶ 78 Defendant has not persuaded us that trial counsel's actions fell outside the bounds of reasonable trial strategy. Counsel used the VSI to impeach B.Q. on multiple points, including: (1) whether Quintero made her masturbate him (but, during rebuttal, B.Q. clarified that she merely struggled to describe the act); (2) whether Quintero digitally penetrated her vagina (but, during rebuttal, B.Q. clarified that she had initially stated "I don't know," because it was difficult to talk about); and (3) whether Quintero made her perform oral sex on him (disclosing this act for the first time in the VSI, as we will discuss in greater detail below). Defendant characterizes the

27

impeachment attempts as futile, merely revealing moments where B.Q. struggled to find her words. Defendant notes that the impeachment attempts ultimately allowed B.Q. to explain her omissions in a manner that enhanced her credibility.

¶ 79    We disagree with defendant that trial counsel's single unsuccessful objection during the State's redirect examination of B.Q. concerning the reading of B.Q.'s complete VSI statement on the question of masturbation, *supra* ¶ 21, shows that counsel did not understand the law. Rather, we agree with the State that counsel's attempts occurred in the context of an extensive cross-examination and were part of a larger strategy to challenge B.Q.'s credibility based upon her evolving disclosures, which defendant argued were prompted by her motives to lie. Counsel's attempts at impeachment were within the bounds of reasonable performance that, in hindsight, failed.

¶ 80    Also, we reject defendant's argument that he was prejudiced because viewing the DVD recording allowed the judge to consider "other bad acts and irrelevant evidence." Defendant relies on *People v. Moore*, 2012 IL App (1st) 100857. In *Moore*, a jury case, defense counsel failed to object to the admission of other-crimes evidence contained on the interrogation DVDs, which included detailed information of prior incidents of domestic abuse, robberies, and gang affiliation. *Id.* ¶¶ 43, 49-51. The appellate court determined that the other-crimes evidence likely prejudiced the jury against defendant such that, absent the evidence, there was a reasonable probability that the outcome of the trial would have been different. *Id.* ¶¶ 45, 51.

¶ 81    Here, defendant does not detail the prior bad acts that are included in the DVD. We note, however, that B.Q. told the VSI interviewer that her mother had recently told her that defendant had "touched other girls" years ago when she, B.Q.'s mother, was in a relationship with defendant. This discussion was vague, fleeting, and occurred at the end of the interview. Thus, this case is

28

unlike *Moore*, which contained detailed information of numerous other crimes. Also, *Moore* was a jury trial. This case was a bench trial and we presume that the trial court considered the DVD evidence for its admitted purpose, here, impeachment. See *People v. Naylor*, 229 Ill. 2d 584, 603 (2008). Contrary to defendant's position on appeal, the trial court's general statement in its oral ruling that it reviewed the VSI does nothing to rebut that presumption.

¶ 82 In sum, we reject defendant's argument that defense counsel provided ineffective assistance in attempting to impeach B.Q. with her prior statements from the VSI, and defendant was not prejudiced by the trial court's viewing of the DVD.

¶ 83                                    III. CONCLUSION

¶ 84 The judgment of the trial court of Will County is affirmed.

¶ 85 Affirmed.